Justice Breyer
delivered the opinion of the Court.
A federal civil-commitment statute authorizes the Department of Justice to detain a mentally ill, sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released. 18 U. S. C. § 4248. We have previously examined similar statutes enacted under state law to determine whether they violate the Due Process Clause. See Kansas v. Hendricks, 521 U. S. 346, 356-358 (1997); Kansas v. Crane, 534 U. S. 407 (2002). But this case presents a different question. Here we ask whether the Federal Government has the authority under Article I of the Constitution to enact this federal civil-commitment program or whether its doing so falls beyond the reach of a government “of *130 enumerated powers.” McCulloch v. Maryland, 4 Wheat. 316, 405 (1819). We conclude that the Constitution grants Congress the authority to enact §4248 as “necessary and proper for carrying into Execution” the powers “vested by” the “Constitution in the Government of the United States.” Art. I, §8, cl. 18.
I
The federal statute before us allows a district court to order the civil commitment of an individual who is currently “in the custody of the [Federal] Bureau of Prisons,” §4248, if that individual (1) has previously “engaged or attempted to engage in sexually violent conduct or child molestation,” (2) currently “suffers from a serious mental illness, abnormality, or disorder,” and (3) “as a result of” that mental illness, abnormality, or disorder is “sexually dangerous to others,” in that “he would have serious difficulty in refraining from sexually violent conduct or child molestation if released,” §§ 4247(a)(5)-(6).
In order to detain such a person, the Government (acting through the Department of Justice) must certify to a federal district judge that the prisoner meets the conditions just described, i. e., that he has engaged in sexually violent activity or child molestation in the past and that he suffers from a mental illness that makes him correspondingly dangerous to others. § 4248(a). When such a certification is filed, the statute automatically stays the individual’s release from prison, ibid., thereby giving the Government an opportunity to prove its claims at a hearing through psychiatric (or other) evidence, §§4247(bMc), 4248(b). The statute provides that the prisoner “shall be represented by counsel” and shall have “an opportunity” at the hearing “to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine” the Government’s witnesses. §§ 4247(d), 4248(c).
If the Government proves its claims by “clear and convincing evidence,” the court will order the prisoner’s continued *131 commitment in “the custody of the Attorney General,” who must “make all reasonable efforts to cause” the State where that person was tried, or the State where he is domiciled, to “assume responsibility for his custody, care, and treatment.” § 4248(d); cf. Sullivan v. Freeman, 944 F. 2d 334, 337 (CA7 1991). If either State is willing to assume that responsibility, the Attorney General “shall release” the individual “to the appropriate official” of that State. § 4248(d). But if, “notwithstanding such efforts, neither such State will assume such responsibility,” then “the Attorney General shall place the person for treatment in a suitable [federal] facility.” Ibid.; cf. § 4247(i)(A).
Confinement in the federal facility will last until either (1) the person’s mental condition improves to the point where he is no longer dangerous (with or without appropriate ongoing treatment), in which case he will be released; or (2) a State assumes responsibility for his custody, care, and treatment, in which case he will be transferred to the custody of that State. §§4248(d)(l)-(2). The statute establishes a system for ongoing psychiatric and judicial review of the individual’s case, including judicial hearings at the request of the confined person at 6-month intervals. §§ 4247(e)(1)(B), (h).
In November and December 2006, the Government instituted proceedings in the Federal District Court for the Eastern District of North Carolina against the five respondents in this case. Three of the five had previously pleaded guilty in federal court to possession of child pornography, see 507 F. Supp. 2d 522, 526, and n. 2 (2007); §2252A(a), and a fourth had pleaded guilty to sexual abuse of a minor, see United States v. Vigil, No. 1:99CR00509-001 (D NM, Jan. 26, 2000); §§ 1153,2243(a). With respect to each of them, the Government claimed that the respondent was about to be released from federal prison, that he had engaged in sexually violent conduct or child molestation in the past, and that he suffered from a mental illness that made him sexually dangerous to *132 others. App. 38-40, 44-52. During that same time period, the Government instituted similar proceedings against the fifth respondent, who had been charged in federal court with aggravated sexual abuse of a minor, but was found mentally incompetent to stand trial. See id., at 41-43; United States v. Catron, No. 04-778 (D Ariz., Mar. 27, 2006); § 4241(d).
Each of the five respondents moved to dismiss the civil-commitment proceeding on constitutional grounds. They claimed that the commitment proceeding is, in fact, criminal, not civil, in nature and consequently that it violates the Double Jeopardy Clause, the Ex Post Facto Clause, and the Sixth and Eighth Amendments. 507 F. Supp. 2d, at 528. They claimed that the statute denies them substantive due process and equal protection of the laws. Ibid. They claimed that it violates their procedural due process rights by allowing a showing of sexual dangerousness to be made by clear and convincing evidence, instead of by proof beyond a reasonable doubt. Ibid. And, finally, they claimed that, in enacting the statute, Congress exceeded the powers granted to it by Article I, § 8, of the Constitution, including those granted by the Commerce Clause and the Necessary and Proper Clause. 507 F. Supp. 2d, at 528-529.
The District Court, accepting two of the respondents’ claims, granted their motion to dismiss. It agreed with respondents that the Constitution requires proof beyond a reasonable doubt, id., at 551-559 (citing In re Winship, 397 U. S. 358 (1970)), and it agreed that, in enacting the statute, Congress exceeded its Article I legislative powers, 507 F. Supp. 2d, at 530-551. On appeal, the Court of Appeals for the Fourth Circuit upheld the dismissal on this latter, legislative-power ground. 551 F. 3d 274, 278-284 (2009). It did not decide the standard-of-proof question, nor did it address any of respondents’ other constitutional challenges. Id., at 276, n. 1.
The Government sought certiorari, and we granted its request, limited to the question of Congress’ authority under *133 Article I, §8, of the Constitution. Pet. for Cert. i. Since then, two other Courts of Appeals have considered that same question, each deciding it in the Government’s favor, thereby creating a split of authority among the Circuits. See United States v. Volungus, 595 F. 3d 1 (CA1 2010); United States v. Tom, 565 F. 3d 497 (CA8 2009).
II
The question presented is whether the Necessary and Proper Clause, Art. I, §8, cl. 18, grants Congress authority sufficient to enact the statute before us. In resolving that question, we assume, but we do not decide, that other provisions of the Constitution — such as the Due Process Clause— do not prohibit civil commitment in these circumstances. Cf. Hendricks, 521 U. S. 346; Addington v. Texas, 441 U. S. 418 (1979). In other words, we assume for argument’s sake that the Federal Constitution would permit a State to enact this statute, and we ask solely whether the Federal Government, exercising its enumerated powers, may enact such a statute as well. On that assumption, we conclude that the Constitution grants Congress legislative power sufficient to enact § 4248. We base this conclusion on ñve considerations, taken together.
First, the Necessary and Proper Clause grants Congress broad authority to enact federal legislation. Nearly 200 years ago, this Court stated that the Federal “[Government is acknowledged by all to be one of enumerated powers,” McCulloch, 4 Wheat., at 405, which means that “[e]very law enacted by Congress must be based on one or more of” those powers, United States v. Morrison, 529 U. S. 598, 607 (2000). But, at the same time, “a government, entrusted with such” powers “must also be entrusted with ample means for their execution.” McCulloch, 4 Wheat., at 408. Accordingly, the Necessary and Proper Clause makes clear that the Constitution’s grants of specific federal legislative authority are accompanied by broad power to enact laws that are “conven *134 ient, or useful” or “conducive” to the authority’s “beneficial exercise.” Id., at 413, 418; see also id., at 421 (“[Congress can] legislate on that vast mass of incidental powers which must be involved in the constitution . . . ”). Chief Justice Marshall emphasized that the word “necessary” does not mean “absolutely necessary.” Id., at 413-415 (emphasis deleted); Jinks v. Richland County, 538 U. S. 456, 462 (2003) C‘[W]e long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be ‘ “absolutely necessary” ’ to the exercise of an enumerated power”). In language that has come to define the scope of the Necessary and Proper Clause, he wrote:
“Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.” McCulloch, supra, at 421.
We have since made clear that, in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power. Sabri v. United States, 541 U. S. 600, 605 (2004) (using term “means-ends rationality” to describe the necessary relationship); ibid, (upholding Congress’ “authority under the Necessary and Proper Clause” to enact a criminal statute in furtherance of the federal power granted by the Spending Clause); see Gonzales v. Raich, 545 U. S. 1, 22 (2005) (holding that because “Congress had a rational basis” for concluding that a statute implements Commerce Clause power, the statute falls within the scope of congressional “authority to ‘make all Laws which shall be necessary and proper’ to ‘regulate Commerce . . . among the several States’” (ellipsis in original)); see also United States v. *135 Lopez, 514 U. S. 549, 557 (1995); Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U. S. 264, 276 (1981).
Of course, as Chief Justice Marshall stated, a federal statute, in addition to being authorized by Art. I, §8, must also “not [be] prohibited” by the Constitution. McCulloch, supra, at 421. But as we have already stated, the present statute’s validity under provisions of the Constitution other than the Necessary and Proper Clause is an issue that is not before us. Under the question presented, the relevant inquiry is simply “whether the means chosen are ‘reasonably adapted’ to the attainment of a legitimate end under the commerce power” or under other powers that the Constitution grants Congress the authority to implement. Gonzales, supra, at 37 (Scaua, J., concurring in judgment) (quoting United States v. Darby, 312 U. S. 100, 121 (1941)).
We have also recognized that the Constitution “ad-dresse[s]” the “choice of means”
“primarily ... to the judgment of Congress. If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.” Burroughs v. United States, 290 U. S. 534, 547-548 (1934).
See also Lottery Case, 188 U. S. 321, 355 (1903) (“[T]he Constitution ... leaves to Congress a large discretion as to the means that may be employed in executing a given power”); Morrison, supra, at 607 (applying a “presumption of constitutionality” when examining the scope of congressional power); McCulloch, supra, at 410, 421.
Thus, the Constitution, which nowhere speaks explicitly about the creation of federal crimes beyond those related to “counterfeiting,” “[tjreason,” or “Piracies and Felonies committed on the high Seas” or “against the Law of Nations,” *136 Art. I, §8, els. 6, 10; Art. Ill, §3, nonetheless grants Congress broad authority to create such crimes. See McCulloch, 4 Wheat., at 416 (“All admit that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of Congress”); see also United States v. Fox, 95 U. S. 670, 672 (1878). And Congress routinely exercises its authority to enact criminal laws in furtherance of, for example, its enumerated powers to regulate interstate and foreign commerce, to enforce civil rights, to spend funds for the general welfare, to establish federal courts, to establish post offices, to regulate bankruptcy, to regulate naturalization, and so forth. . Art. I, § 8, els. 1, 3, 4, 7, 9; Arndts. 13-15. See, e. g., Lottery Case, supra (upholding criminal statute enacted in furtherance of the Commerce Clause); Ex parte Yarbrough, 110 U. S. 651 (1884) (upholding Congress' authority to enact Rev. Stat. §5508, currently 18 U. S. C. § 241 (criminalizing civil-rights violations) and Rev. Stat. § 5520, currently 42 U. S. C. § l'973j (criminalizing voting-rights violations) in furtherance of the Fourteenth and Fifteenth Amendments); Sabri, supra (upholding criminal statute enacted in furtherance of the Spending Clause); Jinks, supra, at 462, n. 2 (describing perjury and witness tampering as federal crimes enacted in furtherance of the power to constitute federal tribunals (citing McCulloch, supra, at 417)); see also 18 U. S. C. § 1691 et seq. (postal crimes); § 151 et seq. (bankruptcy crimes); 8 U. S. C. §§ 1324-1328 (immigration crimes).
Similarly, Congress, in order to help ensure the enforcement of federal criminal laws enacted in furtherance of its enumerated powers, “can cause a prison to be erected at any place within the jurisdiction of the United States, and direct that all persons sentenced to imprisonment under the laws of the United States shall be confined there.” Ex parte Karstendick, 93 U. S. 396, 400 (1876). Moreover, Congress, having established a prison system, can enact laws that seek to ensure that system's safe and responsible administration *137 by, for example, requiring prisoners to receive medical care and educational training, see, e. g., 18 U. S. C. §§ 4005-4006; § 4042(a)(3), and can also ensure the safety of the prisoners, prison workers and visitors, and those in surrounding communities by, for example, creating further criminal laws governing entry, exit, and smuggling, and by employing prison guards to ensure discipline and security, see, e.g., § 1791 (prohibiting smuggling contraband); §751 et seq. (prohibiting escape and abetting thereof); 28 CFR § 541.10 et seq. (2009) (inmate discipline).
Neither Congress’ power to criminalize conduct, nor its power to imprison individuals who engage in that conduct, nor its power to enact laws governing prisons and prisoners, is explicitly mentioned in the Constitution. But Congress nonetheless possesses broad authority to do each of those things in the eourse of “carrying into Execution” the enumerated powers “vested by” the “Constitution in the Government of the United States,” Art. I, §8, cl. 18 — authority granted by the Necessary and Proper Clause.
Second, the civil-commitment statute before us constitutes a modest addition to a set of federal prison-related mental-health statutes that have existed for many decades. We recognize that even a longstanding history of related federal action does not demonstrate a statute’s constitutionality. See, e. g., Walz v. Tax Comm’n of City of New York, 397 U. S. 664, 678 (1970) (“[N]o one acquires a vested or protected right in violation of the Constitution by long use . . . ”); cf. Morrison, 529 U. S., at 612-614 (legislative history is neither necessary nor sufficient with respect to Art. I analysis). A history of involvement, however, can nonetheless be “helpful in reviewing the substance of a congressional statutory scheme,” Gonzales, 545 U. S., at 21; Walz, supra, at 678, and, in particular, the reasonableness of the relation between the new statute and pre-existing federal interests.
Here, Congress has long been involved in the delivery of mental-health care to federal prisoners, and has long pro *138 vided for their civil commitment. In 1855, it established Saint Elizabeth’s Hospital in the District of Columbia to provide treatment to “the insane of the army and navy ... and of the District of Columbia.” Act of Mar. 3, 1855, 10 Stat. 682; 39 Stat. 309. In 1857, it provided for confinement at Saint Elizabeth’s of any person within the District of Columbia who had been “charged with [a] crime” and who was “insane” or later became “insane during the continuance of his or her sentence in the United States penitentiary.” Act of Feb. 7,1857, §§5-6,11 Stat. 158; see 17 Op. Atty. Gen. 211, 212-213 (1881). In 1874, expanding the geographic scope of its statutes, Congress provided for civil commitment in federal facilities (or in state facilities if a State so agreed) of “all persons who have been or shall be convicted of any offense in any court of the United States” and who are or “shall become” insane “during the term of their imprisonment.” Act of June 23,1874, eh. 465,18 Stat. 251 (emphasis added). And in 1882, Congress provided for similar commitment of those “charged” with federal offenses who become “insane” while in the “custody” of the United States. Act of Aug. 7, 1882, 22 Stat. 330 (emphasis added). Thus, over the span of three decades, Congress created a national, federal civil-commitment program under which any person who was either charged with or convicted of any federal offense in any federal court could be confined in a federal mental institution.
These statutes did not raise the question presented here, for they all provided that commitment in a federal hospital would end upon the completion of the relevant “terms” of federal “imprisonment” as set forth in the underlying criminal sentence or statute. §§2-3,18 Stat. 252; see 35 Op. Atty. Gen. 366, 368 (1927); cf. 30 Op. Atty. Gen. 569, 571 (1916). But in the mid-1940’s that proviso was eliminated.
In 1945, the Judicial Conference of the United States proposed legislative reforms of the federal civil-commitment system. The Judicial Conference based its proposals upon *139 what this Court has described as a “long study by a conspicuously able committee” (chaired by Judge Calvert Magruder and whose members includéd Judge Learned Hand), involving consultation “with federal district and circuit judges” across the country as well as with the Department of Justice. Greenwood v. United States, 350 U. S. 366, 373 (1956); Greenwood v. United States, 219 F. 2d 376, 380-384 (CA8 1955) (describing the committee’s work). The committee studied, among other things, the “serious problem faced by the Bureau of Prisons, namely, what to do with insane criminals upon the expiration of their terms of confinement, where it would be dangerous to turn them loose upon society and where no state will assume responsibility for their custody.” Judicial Conference, Report of Committee To Study Treatment Accorded by Federal Courts to Insane Persons Charged With Crime 11 (1945) (hereinafter Committee Report), App. 73. The committee provided examples of instances in which the Bureau of Prisons had struggled with the problem of “ ‘paranoid’ ” and “ ‘threatening’ ” individuals whom no State would accept. Id., at 9, App. 71. And it noted that, in the Bureau’s “[ejxperience,” States would not accept an “appreciable number” of “mental[ly] incompetent” individuals “nearing expiration” of their prison terms, because of their “lack of legal residence in any State,” even though those individuals “ought not... be at large because they constitute a menace to public safety.” H. R. Rep. No. 1319, 81st Cong, 1st Sess., 2 (1949) (statement of James V. Bennett, Director); see also Letter from Bennett to Judge Magruder, attachment to Committee Report, App. 83-88. The committee, hence the Judicial Conference, therefore recommended that Congress enact “some provision of law authorizing the continued confinement of such persons after their sentences expired.” Committee Report 11, App. 73; see also Report of the Judicial Conference of Senior Circuit Judges 13 (1945).
*140 Between 1948 and 1949, following its receipt of the Judicial Conference report, Congress modified the law. See Act of June 25,1948,62 Stat. 855,18 U. S. C. §§4241-4243 (1952 ed.); Act of Sept. 7, 1949, 63 Stat. 686, 18 U. S. C. §§4244-4248. It provided for the civil commitment of individuals who are, or who become, mentally incompetent at any time after their arrest and before the expiration of their federal sentence, §§4241, 4244, 4247-4248; and it set forth various procedural safeguards, §§4242, 4246, 4247. With respect to an individual whose prison term is about to expire, it specified the following:
“Whenever the Director of the Bureau of Prisons shall certify that a prisoner whose sentence is about to expire has been examined [and]... in the judgment of the Director and the board of examiners the prisoner is insane or mentally incompetent, and ... if released he will probably endanger the safety of the officers, the property, or other interests of the United States, and that suitable arrangements for the custody and care of the prisoner are not otherwise available, the Attorney General shall transmit the certificate to ... the court for the district in which the prisoner is confined. Whereupon the court shall cause the prisoner to be examined . . . and shall. .. hold a hearing .... If upon such hearing the court shall determine that the conditions specified above exist, the court may commit the prisoner to the custody of the Attorney General or his authorized representative.” §4247.
The precondition that the mentally ill individual’s release would “probably endanger the safety of the officers, the property, or other interests of the United States” was uniformly interpreted by the Judiciary to mean that his “release would endanger the safety of persons, property or the public interest in general — not merely the interests peculiar to the United States as such.” United States v. Curry, 410 F. 2d *141 1372, 1374 (CA4 1969); see also Royal v. United States, 274 F. 2d 846, 851-852 (CA10 1960).
In 1984, Congress modified these basic statutes. See Insanity Defense Reform Act of 1984, 98 Stat. 2057,18 U. S. C. §§ 4241-4247 (2006 ed.). As relevant here, it altered the provision just discussed, regarding the prisoner’s danger to the “interests of the United States,” to conform more closely to the then-existing judicial interpretation of that language, i. e., it altered the language so as to authorize (explicitly) civil commitment if, in addition to the other conditions, the prisoner’s “release would create a substantial risk of bodily injury to another person or serious damage to the property of another.” § 4246(d).
Congress also elaborated upon the required condition “that suitable arrangements ... are not otherwise available” by directing the Attorney General to seek alternative placement in state facilities, as we have set forth above. See ibid.; supra, at 130-131. With these modifications, the statutes continue to authorize the civil commitment of individuals who are both mentally ill and dangerous, once they have been charged with, or convicted of, a federal crime. §§ 4241(d), 4246; see also § 4243(d). They continue to provide for the continued civil commitment of those individuals when they are “due for release” from federal custody because their “sentence is about to expire.” § 4246. And, as we have previously set forth, they establish various procedural and other requirements. E. g., § 4247.
In 2006, Congress enacted the particular statute before us. § 302,120 Stat. 619,18 U. S. C. § 4248. It differs from earlier statutes in that it focuses directly upon persons who, due to a mental illness, are sexually dangerous. Notably, many of these individuals were likely already subject to civil commitment under §4246, which, since 1949, has authorized the postsentence detention of federal prisoners who suffer from a mental illness and who are thereby dangerous (whether sexually or otherwise). But cf. H. R. Rep. No. 109-218, *142 pt. 1, p. 29 (2005). Aside from its specific focus on sexually dangerous persons, §4248 is similar to the provisions first enacted in 1949. Cf. §4246. In that respect, it is a modest addition to a longstanding federal statutory framework, which has been in place since 1855.
Third, Congress reasonably extended its longstanding civil-commitment system to cover mentally ill and sexually dangerous persons who are already in federal custody, even if doing so detains them beyond the termination of their criminal sentence. For one thing, the Federal Government is the custodian of its prisoners. As federal custodian, it has the constitutional power to act in order to protect nearby (and other) communities from the danger federal prisoners may pose. Cf. Youngberg v. Romeo, 457 U. S. 307, 320 (1982) (“In operating an institution such as .[a prison system], there are occasions in which it is necessary for the State to restrain the movement of residents — for example, to protect them as well as others from violence” (emphasis added)). Indeed, at common law, one “who takes charge of a third person” is “under a duty to exercise reasonable care to control” that person to prevent him from causing reasonably foreseeable “bodily harm to others.” 2 Restatement (Second) of Torts §319, p. 129 (1963-1964); see Volungus, 595 F. 3d, at 7-8 (citing cases); see also United States v. S. A., 129 F. 3d 995, 999 (CA8 1997) (“[Congress enacted §4246] to avert the public danger likely to ensue from the release of mentally ill and dangerous detainees”). If a federal prisoner is infected with a communicable disease that threatens others, surely it would be “necessary and proper” for the Federal Government to take action, pursuant to its role as federal custodian, to refuse (at least until the threat diminishes) to release that individual among the general public, where he might infect others (even if not threatening an interstate epidemic, cf. Art. I, § 8, cl. 3). And if confinement of such an individual is a “necessary and proper” thing to do, then how could it not *143 be similarly “necessary and proper” to confine an individual whose mental illness threatens others to the same degree?
Moreover, § 4248 is “reasonably adapted,” Darby, 312 U. S., at 121, to Congress’ power to act as a responsible federal custodian (a power that rests, in turn, upon federal criminal statutes that legitimately seek to implement constitutionally enumerated authority, see supra, at 135-136). Congress could have reasonably concluded that federal inmates who suffer from a mental illness that causes them to “have serious difficulty in refraining from sexually violent conduct,” § 4247(a)(6), would pose an especially high danger to the public if released. Cf. H. R. Rep. No. 109-218, at 22-23. And Congress could also have reasonably concluded (as detailed in the Judicial Conference’s report) that a reasonable number of such individuals would likely not be detained by the States if released from federal custody, in part because the Federal Government itself severed their claim to “legal residence in any State” by incarcerating them in remote federal prisons. H. R. Rep. No. 1319, at 2; Committee Report 7-11, App. 69-75; cf. post, at 154 (Kennedy, J., concurring in judgment). Here Congress’ desire to address the specific challenges identified in the Reports cited above, taken together with its responsibilities as a federal custodian, supports the conclusion that § 4248 satisfies “review for means-end rationality,” i. e., that it satisfies the Constitution’s insistence that a federal statute represent a rational means for implementing a constitutional grant of legislative authority. Sabri, 541 U. S., at 605 (citing McCulloch, 4 Wheat. 316). See Jinks, 538 U. S., at 462-463 (opinion for the Court by Scalia, J.) (holding that a statute is authorized by the Necessary and Proper Clause when it “provides an alternative to [otherwise] unsatisfactory options” that are “obviously inefficient”).
Fourth, the statute properly accounts for state interests. Respondents and the dissent contend that §4248 violates the Tenth Amendment because it “invades the province of state sovereignty” in an area typically left to state control. New *144 York v. United States, 505 U. S. 144, 155 (1992); see Brief for Respondents 35-47; post, at 164-165, 176-180 (Thomas, J., dissenting). See also Jackson v. Indiana, 406 U. S. 715, 736 (1972) (“The States have traditionally exercised broad power to commit persons found to be mentally ill”). But the Tenth Amendment’s text is clear: “The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” (Emphasis added.) The powers “delegated to the United States by the Constitution” include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary and Proper Clause. Virtually by definition, these powers are not powers that the Constitution “reserved to the States.” See New York, supra, at 156,159 (“If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . .” “In the end ... it makes no difference whether one views the question at issue in these cases as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment”); Darby, supra, at 123-124; see also Hodel, 452 U. S., at 276-277, 281; Maryland v. Wirtz, 392 U. S. 183, 195-196 (1968); Lambert v. Yellowley, 272 U. S. 581, 596 (1926).
Nor does this statute invade state sovereignty or otherwise improperly limit the scope of “powers that remain with the States.” Post, at 164 (Thomas, J., dissenting). To the contrary, it requires accommodation of state interests: The Attorney General must inform the State in which the federal prisoner “is domiciled or was tried” that he is detaining someone with respect to whom those States may wish to assert their authority, and he must encourage those States to assume custody of the individual. § 4248(d). He must also immediately “release” that person “to the appropriate official *145 of” either State “if such State will assume [such] responsibility.” Ibid. And either State has the right, at any time, to assert its authority over the individual, which will prompt the individual’s immediate transfer to state custody. § 4248(d)(1). Respondents contend that the States are nonetheless “powerless to prevent the detention of their citizens under § 4248, even if detention is contrary to the States’ policy choices.” Brief for Respondents 11 (emphasis added). But that is not the most natural reading of the statute, see §§4248(d)(l)-(e), and the Solicitor General acknowledges that “the Federal Government would have no appropriate role” with respect to an individual covered by the statute once “the transfer to State responsibility and State control has occurred.” Tr. of Oral Arg. 9.
In Greenwood, 350 U. S. 366, the Court rejected a challenge to the current statute’s predecessor — i. e., to the 1949 statute we described above, supra, at 140-141. The petitioners in that case claimed, like the respondents here, that the statute improperly interfered with state sovereignty. See Brief for Petitioner in Greenwood v. United States, O. T. 1955, No. 460, pp. 2, 18-29. But the Court rejected that argument. See Greenwood, supra, at 375-376. And the version of the statute at issue in Greenwood was less protective of state interests than the current statute. That statute authorized federal custody so long as “suitable arrangements” were “not otherwise available” in a State or otherwise. 63 Stat. 687 (emphasis added). Cf. Brief for Petitioner in Greenwood, supra, at 25 (“What has really happened is that the Federal government has been dissatisfied with the care given by the states to those mentally incompetent who have been released by the Federal authorities”). Here, by contrast, as we have explained, §4248 requires the Attorney General to encourage the relevant States to take custody of the individual without inquiring into the “suitability” of their intended care or treatment, and to relinquish federal authority whenever a State asserts its own. § 4248(d). Thus, if *146 the statute at issue in Greenwood did not invade state interests, then, a fortiori, neither does §4248.
Fifth, the links between § 4248 and an enumerated Article I power are not too attenuated. Neither is the statutory provision too sweeping in its scope. Invoking the cautionary instruction that we may not “pile inference upon inference” in order to sustain congressional action under Article I, Lopez, 514 U. S., at 567, respondents argue that, when legislating pursuant to the Necessary and Proper Clause, Congress’ authority can be no more than one step removed from a specifically enumerated power. See Brief for Respondents 21-22; Tr. of Oral Arg. 27-28. But this argument is irreconcilable with our precedents. Again, take Greenwood as an example. In that case we upheld the (likely indefinite) civil commitment of a mentally incompetent federal defendant who was accused of robbing a United States Post Office. 350 U. S., at 369, 375. The underlying enumerated Article I power was the power to “Establish Post Offices and post Roads.” Art. I, §8, cl. 7. But, as Chief Justice Marshall recognized in McCulloch,
“the power ‘to establish post offices and post roads’... is executed by the single act of making the establishment. ... [F]rom this has been inferred the power and duty of carrying the mail along the post road, from one post office to another. And, from this implied power, has again been inferred the right to punish those who steal letters from the post office, or rob the mail.” 4 Wheat., at 417 (emphasis added).
And, as we have explained, from the implied power to punish we have further inferred both the power to imprison, see supra, at 136-137, and, in Greenwood, the federal civil-commitment power.
Our necessary and proper jurisprudence contains multiple examples of similar reasoning. For example, in Sabri we observed that “Congress has authority under the Spending *147 Clause to appropriate federal moneys” and that it therefore “has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars” are not “siphoned off” by “corrupt public officers.” 541 U. S., at 605 (citation omitted). We then further held that, in aid of that implied power to criminalize graft of “taxpayer dollars,” Congress has the additional prophylactic power to criminalize bribes or kickbacks even when the stolen funds have not been “traeeably skimmed from specific federal payments.” Id., at 605-606. Similarly, in United States v. Hall, 98 U. S. 343 (1879), we held that the Necessary and Proper Clause grants Congress the power, in furtherance of Art. I, § 8, els. 11-13, to award “pensions to the wounded and disabled” soldiers of the armed forces and their dependents, 98 U. S., at 351; and from that implied power we further inferred the “[i]mplied power” “to pass laws to . . . punish” anyone who fraudulently appropriated such pensions, id., at 346. See also Stewart v. Kahn, 11 Wall. 493, 506-507 (1871).
Indeed, even the dissent acknowledges that Congress has the implied power to criminalize any conduct that might interfere with the exercise of an enumerated power, and also the additional power to imprison people who violate those (inferentially authorized) laws, and the additional power to provide for the safe and reasonable management of those prisons, and the additional power to regulate the prisoners’ behavior even after their release. See post, at 169-170, 173-174, n. 12. Of course, each of those powers, like the powers addressed in Sabri, Hall, and McCulloch, is ultimately “derived from” an enumerated power, Hall, supra, at 346. And, as the dissent agrees, that enumerated power is “the enumerated power that justifies the defendant’s statute of conviction,” post, at 174, n. 12. Neither we nor the dissent can point to a single specific enumerated power “that justifies] a criminal defendant’s arrest or conviction,” post, at 169, in all cases because Congress relies on different enumerated powers (often, but not exclusively, its Commerce Clause *148 power) to enact its various federal criminal statutes, see supra, at 136. But every such statute must itself be legitimately predicated on an enumerated power. And the same enumerated power that justifies the creation of a federal criminal statute, and that justifies the additional implied federal powers that the dissent considers legitimate, justifies civil commitment under § 4248 as well. See supra, at 142-143. Thus, we must reject respondents’ argument that the Necessary and Proper Clause permits no more than a single step between an enumerated power and an Act of Congress.
Nor need we fear that our holding today confers on Congress a general “police power, which the Founders denied the National Government and reposed in the States.” Morrison, 529 U. S., at 618. As the Solicitor General repeatedly confirmed at oral argument, §4248 is narrow in scope. It has been applied to only a small fraction of federal prisoners. See Tr. of Oral Arg. 24-25 (105 individuals have been subject to § 4248 out of over 188,000 federal inmates); see also Dept, of Justice, Bureau of Justice Statistics, W. Sabol, H. West, & M. Cooper, Prisoners in 2008, p. 8 (NCJ 228417, Dec. 2009) (Table 8). And its reach is limited to individuals already “in the custody of the” Federal Government. § 4248(a); Tr. of Oral Arg. 7 (“[Federal authority for §4248] has always depended on the fact of Federal custody, on the fact that this person has entered the criminal justice system . . . ”). Indeed, the Solicitor General argues that “the Federal Government would not have .. . the power to commit a person who ... has been released from prison and whose period of supervised release is also completed.” Id., at 9. Thus, far from a “general police power,” §4248 is a reasonably adapted and narrowly tailored means of pursuing the Government’s legitimate interest as a federal custodian in the responsible administration of its prison system.
To be sure, as we have previously acknowledged:
“The Federal Government undertakes activities today that would have been unimaginable to the Framers in *149 two senses; first, because the Framers would not have conceived that any government would conduct such activities; and second, because the Framers would not have believed that the Federal Government, rather than the States, would assume such responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government’s role.” New York, 505 U. S., at 157.
The Framers demonstrated considerable foresight in drafting a Constitution capable of such resilience through time. As Chief Justice Marshall observed nearly 200 years ago, the Necessary and Proper Clause is part of “a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. ” McCulloch, 4 Wheat., at 415 (emphasis deleted).
* * *
We take these five considerations together. They include: (1) the breadth of the Necessary and Proper Clause, (2) the long history of federal involvement in this arena, (3) the sound reasons for the statute’s enactment in light of the Government’s custodial interest in safeguarding the public from dangers posed by those in federal custody, (4) the statute’s accommodation of state interests, and (5) the statute’s narrow scope. Taken together, these considerations lead us to conclude that the statute is a “necessary and proper” means of exercising the federal authority that permits Congress to create federal criminal laws, to punish their violation, to imprison violators, to provide appropriately for those imprisoned, and to maintain the security of those who are not imprisoned but who may be affected by the federal imprisonment of others. The Constitution consequently authorizes Congress to enact the statute.
We do not reach or decide any claim that the statute or its application denies equal protection of the laws, procedural or *150 substantive due process, or any other rights guaranteed by the Constitution. Respondents are free to pursue those claims on remand, and any others they have preserved.
The judgment of the Court of Appeals for the Fourth Circuit with respect to Congress’ power to enact this statute is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.