Justice THOMAS, dissenting.
The Hobbs Act makes it a federal crime to commit a robbery that "affects" "commerce over which the United States has jurisdiction." 18 U.S.C. §§ 1951(a), 1951(b)(3). Under the Court's decision today, the Government can obtain a Hobbs Act conviction without proving that the defendant's robbery in fact affected interstate commerce-or any commerce. See ante, at 2079 - 2082. The Court's holding creates serious constitutional problems and extends our already expansive, flawed commerce-power precedents. I would construe the Hobbs Act in accordance with constitutional limits and hold that the Act punishes a robbery only when the Government proves that the robbery itself affected interstate commerce.
I
In making it a federal crime to commit a robbery that "affects commerce," § 1951(a), the Hobbs Act invokes the full reach of Congress' commerce power: The Act defines "commerce" to embrace "all ... commerce over which the United States has jurisdiction." § 1951(b)(3). To determine the Hobbs Act's reach, I start by examining the limitations on Congress' authority to punish robbery under its commerce power. In light of those limitations and in accordance with the Hobbs Act's text, I would hold that the Government in a Hobbs Act case may obtain a conviction for robbery only if it proves, beyond a reasonable doubt, that the defendant's robbery itself affected interstate commerce. The Government may not obtain a conviction by proving only that the defendant's robbery affected intrastate commerce or other intrastate activity.
A
Congress possesses only limited authority to prohibit and punish robbery. "The Constitution creates a Federal Government of enumerated powers." United States v. Lopez, 514 U.S. 549, 552, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ; see Art. I, § 8; Marbury v. Madison, 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C.J.) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"). As with its powers generally, Congress has only limited authority over crime. The Government possesses broad general authority in territories and federal enclaves. See Art. I, § 8, cl. 17 (conferring power of "exclusive Legislation" over the District of Columbia); Art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"). But its power over crimes committed in the States is very different. The Constitution expressly delegates to Congress authority over only four specific crimes: counterfeiting *2083 securities and coin of the United States, Art. I, § 8, cl. 6; piracies and felonies committed on the high seas, Art. I, § 8, cl. 10; offenses against the law of nations, ibid. ; and treason, Art. III, § 3, cl. 2. Given these limited grants of federal power, it is "clea[r] that Congress cannot punish felonies generally." Cohens v. Virginia, 6 Wheat. 264, 428, 5 L.Ed. 257 (1821) (Marshall, C. J.). Congress has "no general right to punish murder committed within any of the States," for example, and no general right to punish the many crimes that fall outside of Congress' express grants of criminal authority. Id., at 426. "The Constitution," in short, "withhold[s] from Congress a plenary police power." Lopez, supra, at 566, 115 S.Ct. 1624 ; see Art. I, § 8; Amdt. 10.
Beyond the four express grants of federal criminal authority, then, Congress may validly enact criminal laws only to the extent that doing so is "necessary and proper for carrying into Execution" its enumerated powers or other powers that the Constitution vests in the Federal Government. Art. I, § 8, cl. 18. As Chief Justice Marshall explained, "the [federal] government may, legitimately, punish any violation of its laws" as a necessary and proper means for carrying into execution Congress' enumerated powers. McCulloch v. Maryland, 4 Wheat. 316, 416, 4 L.Ed. 579 (1819) ; see id., at 416-421. But if these limitations are not respected, Congress will accumulate the general police power that the Constitution withholds.
The scope of Congress' power to punish robbery in the Hobbs Act-or in any federal statute-must be assessed in light of these principles. The Commerce Clause-the constitutional provision that the Hobbs Act most clearly invokes-does not authorize Congress to punish robbery. That Clause authorizes Congress to regulate "Commerce ... among the several States." Art. I, § 8, cl. 3. Robbery is not "Commerce" under that Clause. At the founding, "commerce" "consisted of selling, buying, and bartering, as well as transporting for these purposes." Lopez, supra, at 585, 115 S.Ct. 1624 (THOMAS, J., concurring). The Commerce Clause, as originally understood, thus "empowers Congress to regulate the buying and selling of goods and services trafficked across state lines." Gonzales v. Raich, 545 U.S. 1, 58, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (THOMAS, J., dissenting). Robbery is not buying, it is not selling, and it cannot plausibly be described as a commercial transaction ("trade or exchange for value"). Id., at 59, 125 S.Ct. 2195.
Because Congress has no freestanding power to punish robbery and because robbery is not itself "Commerce," Congress may prohibit and punish robbery only to the extent that doing so is "necessary and proper for carrying into Execution" Congress' power to regulate commerce. Art. I, § 8, cl. 18. To be "necessary," Congress' prohibition of robbery must be "plainly adapted" to regulating interstate commerce. McCulloch, supra, at 421. This means that Congress' robbery prohibition must have an "obvious, simple, and direct relation" with the regulation of interstate commerce. Raich, supra, at 61, 125 S.Ct. 2195 (THOMAS, J., dissenting) (internal quotation marks omitted). And for Congress' robbery prohibition to be "proper," it cannot be "prohibited" by the Constitution or inconsistent with its "letter and spirit." McCulloch, supra, at 421; see United States v. Comstock, 560 U.S. 126, 161, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (THOMAS, J., dissenting) (same).
B
With those principles in mind, I turn to the Hobbs Act. The Act provides,
*2084 "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be [punished]." 18 U.S.C. § 1951(a).
In keeping with Congress' authority to regulate certain commerce-but not robbery generally-the central feature of a Hobbs Act crime is an effect on commerce. The Act begins by focusing on commerce and then carefully describes the required relationship between the proscribed conduct and commerce: The Act uses active verbs-"obstructs," "delays," "affects"-to describe how a robbery must relate to commerce, making clear that a defendant's robbery must affect commerce.
The Act's reach depends on the meaning of "commerce," which the Act defines as
"commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." § 1951(b)(3).
As noted above, this provision is comprehensive and appears to invoke all of Congress' commerce power. The first clause of the definition invokes Congress' broad police power, including power over internal commerce, in the District of Columbia and the Territories. See Art. I, § 8, cl. 17 (District of Columbia); Art. IV, § 3, cl. 2 (territories). The second and third clauses most clearly invoke those broad powers as well as Congress' power "[t]o regulate Commerce ... among the several States." Art. I, § 8, cl. 3. The final clause invokes all federal commerce power not covered in the previous clauses. It invokes (to the extent that the second and third clauses do not already do so) Congress' authority "[t]o regulate Commerce with foreign Nations ... and with the Indian Tribes." Ibid.
The critical question in this case is whether the commerce definition's final clause extends further, to some intrastate activity. Given the limitations imposed by the Constitution, I would construe this clause not to reach such activity.
As explained above, for the Hobbs Act to constitutionally prohibit robberies that interfere with intrastate activity, that prohibition would need to be "necessary and proper for carrying into Execution" Congress' power to regulate interstate commerce, Art. I, § 8, cls. 3, 18. See Part I-A, supra . Punishing a local robbery-one that affects only intrastate commerce or other intrastate activity-cannot satisfy that standard. Punishing a local robbery does not bear a "direct relation" to the regulation of interstate commerce, so it would not be "necessary." Raich, 545 U.S., at 61, 125 S.Ct. 2195 (THOMAS, J., dissenting) (internal quotation marks omitted). Nor would punishing such a robbery be "proper." Permitting Congress to criminalize such robberies would confer on Congress a general police power over the Nation-even though the Constitution confers no such power on Congress. Lopez, 514 U.S., at 566, 115 S.Ct. 1624 ; see Raich, 545 U.S., at 65, 125 S.Ct. 2195 (THOMAS, J., dissenting). Allowing the Federal Government to reach a simple home robbery, for example, would "encroac[h] on States' traditional police powers to define the criminal law and to protect ... their citizens." Id., at 66, 125 S.Ct. 2195. This would "subvert basic principles *2085 of federalism and dual sovereignty," id., at 65, 125 S.Ct. 2195 and would be inconsistent with the "letter and spirit" of the Constitution, McCulloch, 4 Wheat., at 421.
Thus, the Hobbs Act reaches a local robbery only when that particular robbery "obstructs, delays, or affects" interstate commerce. §§ 1951(a), 1951(b)(3). So construed, the Hobbs Act validly punishes robbery. Congress' power "[t]o regulate Commerce ... among the several States," Art. I, § 8, cl. 3, "would lack force or practical effect if Congress lacked the authority to enact criminal laws" prohibiting interference with interstate commerce or the movement of articles or goods in interstate commerce, Comstock, supra, at 169, 130 S.Ct. 1949 (THOMAS, J., dissenting). The Hobbs Act's prohibition on such interferences thus helps to "carr[y] into Execution" Congress' enumerated power to regulate interstate commerce. Art. I, § 8, cls. 3, 18. A prohibition on such interference by robbery bears an "obvious, simple, and direct relation" to regulating interstate commerce: it allows commerce to flow between States unobstructed. Raich, supra, at 61, 125 S.Ct. 2195 (THOMAS, J., dissenting) (internal quotation marks omitted). It is therefore "necessary." And such a prohibition accords with the limited nature of the powers that the Constitution confers on Congress, by adhering to the categories of commerce that the Constitution authorizes Congress to regulate and by keeping Congress from exercising a general police power. See, e.g., Lopez, supra, at 566, 115 S.Ct. 1624. It is accordingly "proper" to that extent. If construed to reach a robbery that does not affect interstate commerce, however, the Hobbs Act exceeds Congress' authority because it is no longer "necessary and proper" to the execution of Congress' power "[t]o regulate Commerce ... among the several States," Art. I, § 8, cls. 3, 18. See Part I-A, supra .
Robberies that might satisfy these principles would be those that affect the channels of interstate commerce or instrumentalities of interstate commerce. A robbery that forces an interstate freeway to shut down thus may form the basis for a valid Hobbs Act conviction. So too might a robbery of a truckdriver who is in the course of transporting commercial goods across state lines. But if the Government cannot prove that a robbery in a State affected interstate commerce, then the robbery is not punishable under the Hobbs Act. Sweeping in robberies that do not affect interstate commerce comes too close to conferring on Congress a general police power over the Nation.
Given the Hobbs Act's text and relevant constitutional principles, the Government in a Hobbs Act robbery case (at least one that involves only intrastate robbery) must prove, beyond a reasonable doubt, that the defendant's robbery itself affected interstate commerce. See Alleyne v. United States, 570 U.S. ----, ----, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013) (opinion of THOMAS, J.) (the Sixth Amendment right to a trial " 'by an impartial jury,' " in conjunction with our due process precedents, "requires that each element of a crime be proved to the jury beyond a reasonable doubt"); In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (requiring reasonable-doubt showing on each element of a crime).
C
On this interpretation of the Hobbs Act, petitioner David Anthony Taylor's convictions cannot stand. The Government cites no evidence that Taylor actually obstructed, delayed, or affected interstate commerce when he committed the two intrastate robberies here. The Government did not prove that Taylor affected any channel *2086 of interstate commerce, instrumentality of commerce, or person or thing in interstate commerce. See Lopez, supra, at 558-559, 115 S.Ct. 1624 (describing these core areas of commerce regulation). Nor did the Government prove that Taylor affected an actual commercial transaction-let alone an interstate commercial transaction. At most, the Government proved instead that Taylor robbed two drug dealers in their homes in Virginia; that the marijuana that Taylor expected to (but did not) find in these robberies might possibly at some point have crossed state lines; and that Taylor expected to find large amounts of marijuana. See Brief for United States 35-37; Tr. 63-69, 354, 420-421. Under the principles set forth above, that is not sufficient to bring Taylor's robberies within the Hobbs Act's reach. We should reverse Taylor's Hobbs Act convictions.
II
Upholding Taylor's convictions, the Court reads the Hobbs Act differently. See ante, at 2079 - 2082. The Court concludes that the "commerce over which the United States has jurisdiction," § 1951(b)(3), includes intrastate activity. See ante, at 2079 - 2080. Under our modern precedents, as the Court notes, Congress may regulate not just the channels of interstate commerce, instrumentalities of interstate commerce, and persons or things moving in interstate commerce, but may also regulate "those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce." Lopez, supra, at 558-559, 115 S.Ct. 1624 ; see Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"). The substantial-effects approach is broad, in part because of its "aggregation principle": Congress can regulate an activity-even an intrastate, noncommercial activity-if that activity falls within a "class of activities" that, "as a whole," "substantially affects interstate commerce," even if "any specific activity within the class" has no such effects "when considered in isolation." Lopez, 514 U.S., at 600, 115 S.Ct. 1624 (THOMAS, J., concurring) (emphasis deleted). According to the Court, the final clause of the Hobbs Act's definition of commerce embraces this category of activities that, in the aggregate, substantially affect commerce. See ante, at 2079 - 2080. Any robbery that targets a marijuana dealer, the Court then holds, affects the type of intrastate activity that Congress may regulate under its commerce power. See ante, at 2079 - 2082. For at least three reasons, the Court's holding is in error.
A
Although our modern precedents (such as Wickard ) embrace the substantial-effects approach, applying that approach to the Hobbs Act is tantamount to abandoning any limits on Congress' commerce power-even the slight limits recognized by our expansive modern precedents. As I have explained, if the Hobbs Act is construed to punish a robbery that by itself affects only intrastate activity, then the Act defies the constitutional design. See Part I, supra .
That is true even under our modern precedents. Even those precedents emphasize that "[t]he Constitution requires a distinction between what is truly national and what is truly local." United States v. Morrison, 529 U.S. 598, 617-618, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ; see Lopez, 514 U.S., at 567-568, 115 S.Ct. 1624. The substantial-effects approach is at war with *2087 that principle. To avoid giving Congress a general police power, there must be some limit to what Congress can regulate. But the substantial-effects approach's aggregation principle "has no stopping point." Id., at 600, 115 S.Ct. 1624 (THOMAS, J., concurring). "[O]ne always can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce." Ibid. Under the substantial-effects approach, Congress could, under its commerce power, regulate any robbery: In the aggregate, any type of robbery could be deemed to substantially affect interstate commerce.
By applying the substantial-effects test to the criminal prohibition before us, the Court effectively gives Congress a police power. That is why the Court cannot identify any true limit on its understanding of the commerce power. Although the Court maintains that its holding "is limited to cases in which the defendant targets drug dealers for the purpose of stealing drugs or drug proceeds," ante, at 2082, its reasoning allows for unbounded regulation. Given that the Hobbs Act can be read in a way that does not give Congress a general police power, see Part I, supra, we should not construe the statute as the Court does today.
B
Applying the substantial-effects approach is especially unsound here because it effectively relieves the Government of its central burden in a criminal case-the burden to prove every element beyond a reasonable doubt-and because the Court's holding does not follow from even our broad precedents. The Court reasons that, under Gonzales v. Raich, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 -a case that rests on substantial-effects reasoning, see id., at 17-22, 125 S.Ct. 2195 -"the market for marijuana, including its intrastate aspects, is 'commerce over which the United States has jurisdiction.' " Ante, at 2080 (quoting § 1951(b)(3) ). Therefore, "a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction." Ante, at 2080. As the Court later states, "[W]here the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect." Ante, at 2081.
Raich is too thin a reed to support the Court's holding. Raich upheld the federal Controlled Substances Act's regulation of "the intrastate manufacture and possession of marijuana" for personal medical use, 545 U.S., at 15, 125 S.Ct. 2195 on the view that Congress "had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana" would undercut federal regulation of the broader interstate marijuana market, id., at 22, 125 S.Ct. 2195. The Court "stress[ed]" that it did not "need [to] determine whether [local cultivation and possession of marijuana], taken in the aggregate, substantially affect[ed] interstate commerce in fact, but only whether a 'rational basis' exist[ed] for so concluding." Ibid.
As an initial matter, Raich did not, as the Court suggests, hold that "the market for marijuana, including its intrastate aspects, is 'commerce over which the United States has jurisdiction.' " Ante, at 2080 (emphasis added). Raich held at most that the market for marijuana comprises activities that may substantially affect commerce over which the United States has jurisdiction. See, e.g., *2088 Raich, supra, at 21-22, 125 S.Ct. 2195. Those activities are not necessarily "commerce," so Raich 's holding does not establish what the Hobbs Act's text requires.
But even if Raich established that the intrastate aspects of the marijuana market are "commerce over which the United States has jurisdiction," § 1951(b)(3), Raich still would not establish the further point that the Court needs for its conclusion. Specifically, Raich would not establish that a robbery affecting a drug dealer establishes, beyond a reasonable doubt, that the robber actually "obstructs, delays, or affects" the marijuana market. § 1951(a). Raich did not hold that any activity relating to the marijuana market in fact affects commerce. Raich instead disclaimed the need to "determine whether" activities relating to the marijuana market-even "taken in the aggregate"-"substantially affect interstate commerce in fact." 545 U.S., at 22, 125 S.Ct. 2195. Raich decided only that Congress had a rational basis-a merely " 'conceivable' " basis, FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) -for thinking that it needed to regulate that activity as part of an effective regulatory regime. 545 U.S., at 22, 125 S.Ct. 2195. That is far from a finding, beyond a reasonable doubt, that a particular robbery relating to marijuana is an activity that affects interstate commerce. Grafting Raich 's "holding ... onto the commerce element of the Hobbs Act" thus does not lead to the conclusion that "a robber who affects or attempts to affect ... the intrastate sale of marijuana grown within [a] State affects or attempts to affect"-beyond a reasonable doubt-"commerce over which the United States has jurisdiction." Ante, at 2080.
The Court's analysis thus provides no assurance that the Government has proved beyond a reasonable doubt that a Hobbs Act robbery defendant in fact affected commerce. And it unnecessarily extends our already broad precedents.
C
Finally, today's decision weakens longstanding protections for criminal defendants. The criminal law imposes especially high burdens on the Government in order to protect the rights of the accused. The Government may obtain a conviction only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged." Winship, 397 U.S., at 364, 90 S.Ct. 1068. Those elements must be proved to a jury. Amdt. 6; see Alleyne, 570 U.S., at ----, 133 S.Ct., at 2156 (opinion of THOMAS, J.). Given the harshness of criminal penalties on "the rights of individuals," the Court has long recognized that penal laws "are to be construed strictly" to ensure that Congress has indeed decided to make the conduct at issue criminal. United States v. Wiltberger, 5 Wheat. 76, 95, 5 L.Ed. 37 (1820) (Marshall, C.J.). Thus, "before a man can be punished as a criminal under the federal law his case must be plainly and unmistakably within the provisions of some statute." United States v. Gradwell, 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917) (internal quotation marks omitted). When courts construe criminal statutes, then, they must be especially careful. And when a broad reading of a criminal statute would upset federalism, courts must be more careful still. "[U]nless Congress conveys its purpose clearly," we do not deem it "to have significantly changed the federal-state balance in the prosecution of crimes." Jones v. United States, 529 U.S. 848, 858, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (internal quotation marks omitted).
The substantial-effects test is in tension with these principles. That test-and the deferential, rational-basis review to which it is subjected, see *2089 Raich, supra, at 22, 125 S.Ct. 2195 -puts virtually no burdens on the Government. That should not come as a surprise because the substantial-effects test gained momentum not in the criminal context, but instead in the context in which courts most defer to the Government: the regulatory arena. E.g., Wickard, 317 U.S., at 113, 122-125, 128-129, 63 S.Ct. 82 (relying on substantial-effects reasoning to uphold regulatory restrictions on wheat under the Agricultural Adjustment Act of 1938). Without adequate reflection, the Court later extended this approach to the criminal context. In Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), for example, the Court applied the substantial-effects approach to a criminal statute, holding that Congress could criminally punish loansharking under its commerce power because "[e]xtortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce" when judged as a "class of activities." Id., at 154, 91 S.Ct. 1357 (emphasis deleted); see id., at 151-154, 156-157, 91 S.Ct. 1357.
Even in extending the substantial-effects approach, however, the Court still tried to impose some of the recognized limits on the Government in the criminal context. Just a year before it decided Perez, for example, the Court held that the Government must prove each charged element of a crime beyond a reasonable doubt. Winship, supra, at 364, 90 S.Ct. 1068. And the Court shortly thereafter gave a potentially broad federal statute a narrow reading-a reading that required a prohibited act to have a "demonstrated nexus with interstate commerce," rather than a lesser showing-based on lenity and federalism. United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ; see id., at 339, 347-350, 92 S.Ct. 515. Indeed, the Court soon again invoked those same principles in rejecting a broad interpretation of the Hobbs Act itself. See United States v. Enmons, 410 U.S. 396, 410-412, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) (invoking principles of lenity and federalism in construing the Hobbs Act not to reach the use of violence to achieve legitimate union objectives).
Today, however, the Court fails to apply even those limits. Today's decision fails to hold the Government to its burden to prove, beyond a reasonable doubt, that the defendant's robbery itself affected commerce. It fails to identify language in the Hobbs Act that " 'conveys ... clearly' " Congress' intention to reach the sorts of local, small-scale robberies that States traditionally prosecute. Jones, supra, at 858, 120 S.Ct. 1904. And it fails to take our traditionally careful approach to construing criminal statutes. Given the problems with the Court's expansive reading of the Hobbs Act, we cannot be sure that Taylor's "case" is "plainly and unmistakably within the provisions of" the Act. Gradwell, supra, at 485, 37 S.Ct. 407 (internal quotation marks omitted). It does not matter that Taylor committed a crime akin to the one that the Hobbs Act punishes. "It would be dangerous" to punish someone for "a crime not enumerated in the statute" merely "because it is of equal atrocity, or of kindred character, with those which are enumerated." Wiltberger, supra, at 96.
The Court takes that "dangerous" step-and other dangerous steps-today. It construes the Hobbs Act in a way that conflicts with the Constitution, with our precedents, and with longstanding protections for the accused. I would interpret the Hobbs Act in a way that is consistent with its text and with the Constitution.
* * *
For these reasons, I respectfully dissent.