# United States Court of Appeals
## For the First Circuit

No. 09-1330

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

JEFFREY SHIELDS,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez, Circuit Judge,
and Woodcock,* District Judge.

Judith H. Mizner, Assistant Federal Public Defender, for appellant.
Samantha L. Chaifetz, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Tony West, Assistant Attorney General, Carmen M. Ortiz, United States Attorney, and Mark B. Stern, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellee.

August 11, 2011

* Of the District of Maine, sitting by designation.

**LIPEZ, Circuit Judge.** Jeffrey Shields was convicted in 2002 by a federal court for possession of child pornography. In 2006, a day before his scheduled release from custody, the Bureau of Prisons filed a petition in the District Court for the District of Massachusetts to have Shields civilly committed as a "sexually dangerous person" under the authority of 18 U.S.C. § 4248. After a ten-day bench trial with an advisory jury, during which the court heard evidence of Shields's history of child molestation as well as opinions from several clinical psychologists on the risk that Shields would commit future offenses, the court found that the government had met its burden of proving Shields to be "sexually dangerous" and ordered him committed.

In this appeal, Shields raises two primary challenges to his civil commitment. First, he argues that he was not lawfully in the custody of the Bureau of Prisons at the time the commitment proceedings were initiated, and accordingly that the Bureau's petition should have been dismissed. Second, Shields argues that the district court erred in concluding that the government met its burden of proving his sexual dangerousness by "clear and convincing evidence." In addition, Shields pursues a number of challenges to the constitutionality of the commitment scheme, all of which are foreclosed by precedent or have been waived. After a careful review of the record, we find no error in the district court's factfinding and legal analysis, and therefore we affirm.

**A.  Factual Background**

In recounting the factual background of this case, we draw on the district court's findings of fact as well as testimony presented at trial.

Jeffrey Shields's history of sexual abuse is a lengthy one, over the troubled course of which he has been both victim and perpetrator.  Between the ages of seven and eleven, he was repeatedly assaulted and raped by two teenage neighbors.  Then, after moving in with his grandmother at the age of eleven, he was molested by his fifteen-year-old cousin.  A series of further misfortunes landed him on the streets working as a prostitute in Florida by the age of thirteen.

Shields's first documented sexual offense occurred in May 1988, when, at the age of twenty-six, he was convicted in Florida for making phone calls to two boys to solicit oral sex.  He received a sentence of six months' probation.  The following year, Shields committed a series of sexual offenses -- three in Maine and one in Florida -- against boys aged six, nine, thirteen, and fourteen.  The authorities caught up with Shields in Maine, where he was arrested in September 1989.  Upon his arrest, Shields communicated that he was sick and wanted to be placed in a hospital where he could receive help.  In February 1990, Shields pled guilty to the three sexual offenses that took place in Maine, receiving a

sentence of five years.  A significant portion of his sentence was suspended, and thus Shields was only incarcerated until January 1992.

Shields was on probation until March 1996, during which time he completed a three-year sex offender counseling program.  He reported that the program, which consisted of weekly, two-hour group counseling meetings, was of little aid.  And, indeed, in 1998, two years after his probation ended, he was convicted in state court of another charge of unlawful sexual contact, this time with a twelve-year-old boy.  Shields at first refused to take responsibility for the offense, characterizing the boy (a transient who was living in a Portland, Maine homeless shelter) as a prostitute.  He eventually pled guilty and received a term of five years, all but 112 days of which was suspended.

The terms of Shields's probation for the 1998 offense required that he register as a sex offender, avoid contact with children under the age of sixteen, and participate in further sex offender treatment.  This second round of treatment involved individual as well as group counseling sessions. As the district court noted, the second counseling program differed from Shields's earlier treatment in that it appeared to have been based on cognitive behavioral therapy, the leading approach for treatment of sex offenders.  Shields reports that this treatment program, in which he participated until 2001, was more helpful than the first,

though it appears to have been interrupted by periods of incarceration: between 1998 and 2001, Shields's probation was revoked twice for probation violations (neither of which involved sexual misconduct).

In September 2002, Shields was arrested again when the authorities discovered thousands of pictures on his computer depicting adolescent and prepubescent children engaged in sexual conduct. As a result, Shields's state probation was revoked and he was charged in federal court with possession of child pornography. Shields pled guilty and was sentenced to fifty-seven months in prison, with three years of supervised release to follow.

Shields sought additional treatment during this renewed period of incarceration. He successfully petitioned for transfer from the United States Penitentiary in Lewisburg, Pennsylvania, where he was initially incarcerated, to the Federal Correctional Institution at Butner (FCI-Butner) in North Carolina so that he could enroll in drug and sex offender treatment programs offered there. At FCI-Butner, Shields was placed on a waiting list for the sex offender treatment program; in the interim he began treatment for depression with Dr. Dawn Graney, a clinical psychologist. Shields continued counseling with Dr. Graney for the duration of his time at FCI-Butner, attending roughly fifty sessions over two years. He also participated in drug treatment. However, he refused to enter the sex offender treatment program when space

eventually became available, explaining to Dr. Graney that he was not in the "right state of mind" to benefit from the treatment program. Dr. Graney later testified that she agreed with Shields's assessment, concluding that his depression and other mental health issues were likely to interfere with effective treatment. Despite his unwillingness to proceed with treatment at FCI-Butner, Shields told Dr. Graney that he was committed to entering a treatment program in conjunction with his release.

In September 2006, Shields was transferred to a federal halfway house to serve out the remaining two months of his sentence. On November 8, one day before Shields's scheduled release, the Bureau of Prisons certified him as a "sexually dangerous person" and initiated civil commitment proceedings under 18 U.S.C. § 4248.

## B. Statutory Background

The civil commitment scheme at issue in this case is set forth in the Adam Walsh Child Protection and Safety Act of 2006 (Walsh Act), Pub. L. No. 109-248, 120 Stat. 587 (codified as amended in scattered sections of 18 and 42 U.S.C.). Building on an existing statutory scheme for civil commitment of mentally ill persons in federal custody, see 18 U.S.C. §§ 4246, 4247, the Walsh Act introduced a parallel procedure for committing "sexually dangerous persons" who either are in the custody of the Bureau of Prisons, have been determined mentally incompetent to stand trial

and committed to the custody of the Attorney General, or have had criminal charges dismissed on the basis of a mental illness. Id. § 4248(a). A "sexually dangerous person" is defined by statute to mean a person who (1) "has engaged or attempted to engage in sexually violent conduct or child molestation" and (2) "is sexually dangerous to others." Id. § 4247(a)(5). In turn, "sexually dangerous to others" is defined to mean "that the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6).

A commitment proceeding under the Walsh Act begins with the filing of a petition in the federal district court for the district in which the individual to be committed (the respondent) is confined. Id. § 4248(a). The petition, which may be filed by the Attorney General, the Director of the Bureau of Prisons, or a designee of either official, must include a certification that the respondent qualifies as a sexually dangerous person. Id. The filing of a petition will stay the release of the respondent "pending completion of procedures" set forth in the statute, id., which include a full evidentiary hearing with an opportunity for the respondent to testify, subpoena and present witnesses, and cross-examine government witnesses. Id. §§ 4247(d), 4248(c).

-7-

To prevail on its petition, the government must prove by "clear and convincing evidence" the following three elements, which track the statute's definition of "sexually dangerous person": (1) "a prior act (or attempted act) of 'violent sexual conduct or child molestation'"; (2) "'a serious mental illness, abnormality, or disorder'"; and (3) "a resulting 'serious difficulty in refraining from sexually violent conduct or child molestation if released.'" United States v. Carta, 592 F.3d 34, 39, 42 (1st Cir. 2010) (quoting 18 U.S.C. § 4247(a)(5), (6)); see also 18 U.S.C. § 4248(d).[1] Upon a finding that those elements have been adequately established, the district court will commit the respondent to the custody of the Attorney General. 18 U.S.C. § 4248(d). If the state in which the respondent was domiciled or tried will accept custody, the Attorney General must transfer the respondent to the state for "custody, care, and treatment." Id. Otherwise, the Attorney General must place the respondent in a "suitable facility" for treatment until such time as the state accepts custody or the respondent ceases to be sexually dangerous. Id.

Once committed, the respondent is entitled to seek periodic review of his commitment by filing a motion for a

---

[1] The district court held that due process requires that the first element be established beyond a reasonable doubt, rather than under the "clear and convincing evidence" standard specified in the statute. As Shields's history of sexual offenses is uncontested, this appeal gives us no occasion to review that holding.

discharge hearing with the district court.  Id. § 4247(h).  The only limitation on such review is that the respondent cannot file a motion until 180 days have passed from the most recent commitment determination by the court.  Id.

## C.  Procedural History

In May 2007, Shields filed a motion to dismiss the government's commitment petition, joining two other similarly situated respondents in challenging the constitutionality of the Walsh Act's commitment scheme.  The respondents presented a raft of arguments, including that the commitment scheme exceeded the scope of congressional authority under Article I, section 8 of the Constitution; that the scheme violated due process by failing to require proof of sexual dangerousness beyond a reasonable doubt, and by failing to define key terms such as, inter alia, "sexually violent conduct" and "child molestation"; and that the commitment proceedings were criminal in nature but lacked the constitutionally mandated procedural protections that attend criminal prosecutions. The district court largely rejected these challenges,[2] finding the

---

[2] Not all of the respondents' arguments failed outright.  As mentioned in note 2, supra, the district court agreed that the statute's application of a "clear and convincing evidence" standard of proof to the determination of whether the respondent had previously committed or attempted an act of "violent sexual conduct or child molestation" was a violation of due process, but addressed the problem by severing the evidentiary language from the statute and requiring proof of the "prior act" element beyond a reasonable doubt.  The court also held that due process would require an opportunity for a probable cause hearing before a neutral decisionmaker within a reasonable time following any stay of

Walsh Act's commitment scheme to be a necessary and proper exercise of congressional authority.[3]

Shields filed a second motion to dismiss in November 2007, arguing that he was not legally "in the custody" of the Bureau of Prisons at the time the commitment petition was filed, and thus he was not properly subject to civil commitment under the Walsh Act. The factual predicate for Shields's argument was an error in the calculation of his release date. Shields was taken into custody on child pornography charges and state probation violations on September 18, 2002. When he was sentenced for the federal charges in November of the following year, he received credit for time served from the date he was taken into custody, but the Bureau of Prisons mistakenly used a date of September 20, 2002 to calculate the credit.[4] As an audit by the Bureau of Prisons

_____

release triggered by a petition under § 4248.

[3] As discussed below, see infra Part II.A, this circuit subsequently resolved, in two separate appeals, many of the constitutional arguments raised by Shields. See Carta, 592 F.3d 34; United States v. Volungus, 595 F.3d 1 (1st Cir. 2010).

[4] The source of this error is not entirely clear, as the Bureau of Prisons examiner who calculated Shields's sentence possessed all of the relevant dates necessary to make the proper calculation, including Shields's September 18 arrest date. Shields suggests that the examiner mistakenly counted from September 20 because that was the date upon which the State of Maine moved for revocation of probation. Our review suggests that the error is more likely traceable to the district court's judgment sentencing Shields on the child pornography charges, which listed September 20 as the "date [the] offense concluded." The Bureau of Prisons examiner appears to have believed, in reliance on this language from the federal court judgment, that Shields's arrest on September

would later confirm, this error resulted in a two-day undercalculation of Shields's credit for time served; therefore, his release should have been scheduled for November 7, 2006, the day before the commitment petition was filed, rather than November 9, 2006, the actual date of Shields's scheduled release. Shields argued on this basis that he was not properly in custody when the Bureau initiated civil commitment proceedings. The district court rejected this claim in a one-sentence electronic order. The court similarly rebuffed a motion for reconsideration, explaining in its order that Shields "was in custody on the date of the certification and there is no evidence that the period of custody was prolonged in bad faith."

In September 2008, the matter proceeded to a ten-day trial before an advisory jury, empaneled at Shields's request.[5] The court heard testimony from three expert witnesses, all of whom

_____

18 related solely to his state probation violations, and therefore that September 18 and 19 could not be taken into account for purposes of the credit.

[5] The use of the advisory jury is not provided for by the Walsh Act itself. Rather, the advisory jury was used pursuant to Federal Rule of Civil Procedure 39(c)(1), which grants a district court the discretion to empanel an advisory jury either on a party's motion or sua sponte. The role of a jury so empaneled is, as the name would suggest, purely advisory in nature; "[t]he responsibility for the decision-rendering process remains with the trial judge" and "it is in its discretion whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury." 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2335, at 354-56 (3d ed. 2008).

were licensed clinical psychologists.[6] In addition to an examiner appointed by the court, see 18 U.S.C. §§ 4247(b), 4248(b), the government and Shields each retained an independent expert. Based on a review of Shields's background records -- and, in the case of the court-appointed expert and Shields's retained expert, clinical interviews with Shields[7] -- the three experts all testified that Shields suffers from pedophilia, a serious disorder characterized by "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 572 (4th ed. 2000).

The experts' testimony diverged on the question of whether Shields's pedophilia would cause him to have "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Each expert used an "adjusted actuarial approach" to gauge Shields's likelihood

---

[6] Shields called an additional five witnesses, including Dr. Graney, who treated Shields at FCI-Butner; the case manager at the halfway house to which Shields was transferred pending his scheduled release in 2006; a federal probation officer in Portland, where he was to be released; a police detective in Portland responsible for registering and monitoring sex offenders; and a clinical social worker who would provide sex offender treatment to Shields upon his release. The bulk of the testimony from these witnesses related to (1) Shields's preparations for release from prison and (2) the treatment programs Shields would participate in and the probationary restrictions that would be imposed should he be released rather than committed.

[7] Shields refused to submit to an interview by the government's retained expert.

of committing future offenses. This method starts with a standardized actuarial tool that quantifies risk of recidivism, and then adjusts the risk prediction based upon mitigating or aggravating factors. The court-appointed expert described the actuarial tools as, at best, "moderate predictors of risk," but testified that they facilitate a "greater than chance prediction" of the likelihood of reoffense.

Employing one such actuarial tool known as the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR), which relies on an assessment of four factors, the court-appointed examiner scored Shields a five out of six possible points. The expert explained that, in the studies underlying the RRASOR, 49.8 percent of offenders with Shields's score reoffended within five years; extrapolating from that data, researchers predict a 73.1 percent recidivism rate over ten years. The other two experts used a different tool, the "Static-99," which analyzes ten factors rather than four. Both experts scored Shields an eight out of a possible twelve points, placing him in a "high risk" category, with predicted reoffense rates of 39 percent for the first five years, 45 percent for ten years, and 52 percent for fifteen years.

The experts each considered additional "dynamic" factors to adjust the risk rates returned by the actuarial models. One of the primary dynamic factors considered was age, as the risk of reoffense is significantly lower for older offenders. The court-

appointed expert and the government's expert each concluded that Shields, at forty-seven years old, was not yet of an age where the risk of recidivism declines. As the court-appointed expert noted, data for extra-familial offenders like Shields suggests that recidivism rates in that group do not begin to decline significantly until the offender reaches the age of fifty. The court-appointed expert also considered Shields's treatment history. Though compliance with a treatment plan may reduce risk, the expert found a reduction unwarranted in light of Shields's relapses after prior treatment. Finally, both the court-appointed expert and government's expert cited Shields's recent child pornography offense as evidence of ongoing sexual deviance and, accordingly, increased risk of recidivism. Each of the two experts concluded that Shields was at significant risk of reoffending if released.

Shields's expert reached the opposite conclusion, emphasizing evidence of positive changes in Shields's behavioral patterns. He described Shields's most recent offense for possession of child pornography as "qualitatively much different" than Shields's earlier "contact" sexual offenses, suggestive of a downward trajectory in Shields's compulsive behavior and sexual deviance. He also noted the absence of any conduct typically associated with compulsive pedophilia (e.g., cutting out and collecting pictures of young children from magazines and brochures)

during Shields's time in prison, as well as Shields's commitment to treatment and a sober lifestyle.

At the close of trial, the advisory jury returned a special verdict form finding that the government had proven by clear and convincing evidence that Shields suffered from a serious mental illness.  The jury reported, however, that it was "unable to answer" whether the government had adequately proven that Shields would have serious difficulty refraining from future sexually violent conduct or molestation.  The district court resolved the question several months later in a comprehensive order.  Weighing the testimony of the three expert witnesses, the district court agreed with Shields's expert that there were some signs of positive change in Shields's record.  However, the court found troubling the fact that "Shields has never seriously engaged in sex offender treatment despite three opportunities."  Noting that Shields's expert failed to persuasively address this inauspicious treatment history, the court concluded that the government had met its burden of demonstrating by clear and convincing evidence that Shields would have serious difficulty refraining from child molestation if released.  The court emphasized the contingent nature of its determination, stating that, with progress in treatment, "the analysis in this case could be very different in just a short

period of time." Until such time, the court ordered that Shields be civilly committed to the custody of the Attorney General.[8]

This timely appeal followed.

## II.

Shields raises three issues on appeal. First, Shields reprises his constitutional challenges to the Walsh Act's civil commitment scheme, contending that Congress lacked constitutional authority to enact the commitment statute; that the statute fails to afford the procedural safeguards required by due process; and that the statute is unconstitutionally vague and represents an improper delegation of legislative authority due to its failure to adequately define key terms. Second, Shields argues that he was not lawfully in the custody of the Bureau of Prisons at the outset of the commitment proceedings, and that the district court erred in

---

[8] While this appeal was pending, Shields was granted conditional release, following a June 2011 hearing on a motion for release pursuant to 18 U.S.C. § 4247(h). The district court found that Shields, who underwent sexual offender treatment following his commitment, had "recovered from his mental disease or defect to the extent that his release under a prescribed regimen of medical, psychiatric, or psychological treatment would no longer create a substantial risk of bodily injury to another person." The order of release imposed a lengthy set of conditions (including regular participation in sex offender and substance abuse treatment), violation of any of which would require that Shields be returned to the custody of the Attorney General. Because these conditions are ongoing -- most are not time-limited, though Shields can petition the court to modify or terminate them -- Shields's conditional release does not moot this appeal. Cf. United States v. DeLeon, 444 F.3d 41, 55 (1st Cir. 2006) ("It is well-settled that a convict's claim is not moot if he has finished his prison term but still faces supervised release . . . .").

-16-

declining to dismiss the action on that basis.  Third, Shields argues that the court erred in finding that the government met its burden of showing him to be a "sexually dangerous person" by clear and convincing evidence.  We address each argument in turn.

## A.  Constitutional Arguments

We need spend little time on the first line of argument, for, as Shields acknowledges, his constitutional challenges to the Walsh Act's commitment scheme largely have been foreclosed.[9]  In United States v. Volungus, 595 F.3d 1 (1st Cir. 2010), we held that the enactment of the Walsh Act was a constitutionally sound exercise of Congress's powers under the Necessary and Proper Clause, Article I, section 8 of the Constitution, a holding that was subsequently confirmed by the Supreme Court in United States v. Comstock, 130 S. Ct. 1949 (2010).  We likewise addressed and disposed of due process arguments substantively identical to those Shields makes here in United States v. Carta, 592 F.3d 34 (1st Cir. 2010), decided a week after Volungus.

Finally, we also held in Carta that the key terms in the Walsh Act's commitment provision were "sufficiently explicit to give notice and prevent arbitrary enforcement," and therefore could not be considered so vague as to violate due process.  Id. at 43. Though Shields halfheartedly contends that Carta did not directly

[9] Shields indicates in his brief that he raises these issues "to preserve [them] for possible further review."

-17-

dispose of his companion argument that the purported vagueness of the statute's terms results in an unconstitutional delegation of legislative authority, he fails to develop that argument in his briefing or cite any supporting authority. We consider the argument waived and therefore decline to consider it here. See Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010) ("[A]ppellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived.").

## B. Timing of the Commitment Petition

As laid out above, § 4248 provides for the initiation of civil commitment proceedings against, inter alia, persons "in the custody of the Bureau of Prisons." 18 U.S.C. § 4248(a). Shields argues that the Bureau of Prisons could not rightfully claim "custody" of him when the commitment petition was filed, as he should have been released the previous day. This purported defect in the legality of the Bureau's custody of Shields is indisputably minor, arising from a two-day miscalculation in Shields's sentence that led to his commitment petition being filed a day late. Notwithstanding the minimal nature of the error, Shields contends that we must construe the "custody" requirement strictly, and that the delay in filing the petition required his release.[10] We

---

[10] Two of the judges on this panel have serious questions about whether, in an appropriate circumstance, waiver may bar a defendant from challenging Bureau of Prisons custody calculations under § 4248. Although Shields certainly knew his arrest date, he did nothing to challenge the calculation of his release date until

-18-

disagree.

A similar question came before the Supreme Court in United States v. Montalvo-Murillo, 495 U.S. 711 (1990).  That case involved application of the Bail Reform Act of 1984, which specifies that a detention hearing must be held immediately upon a criminal detainee's first appearance before a judge, with provision for no more than a five-day continuance.  Id. at 714; 18 U.S.C. § 3142(f).  En route to the Supreme Court, the district and appeals courts had both determined that the remedy for any failure to meet the statute's requirement for a timely hearing must be pretrial release of the detainee, regardless of whether the detainee posed a risk of flight and a danger to the community.  495 U.S. at 716.

The Court reversed.  While acknowledging that the duty to abide by the statutory time limits for a detention hearing was a mandatory one, the Court held that "the sanction for breach is not loss of all later powers to act."  Id. at 718.  In so holding, the Court looked to the purposes of the Bail Reform Act and concluded that requiring release to remedy a defect in the timing of the detention hearing would defeat those purposes:

> Automatic release contravenes the object of
> the statute, to provide fair bail procedures
> while protecting the safety of the public and

November 2007, nearly a year after the petition was filed.  Had the government been made aware earlier that there was a calculation issue, it might have acted sooner.  Nevertheless, waiver was not raised, the record is undeveloped, and resolution of the waiver issue is not necessary for this decision.

assuring the appearance at trial of defendants found likely to flee. The end of exacting compliance with the letter of § 3142(f) cannot justify the means of exposing the public to an increased likelihood of violent crime by persons on bail, an evil the statute aims to prevent. The Government's interest in preventing these harms remains real and substantial even when the time limits have been ignored. The safety of society does not become forfeit to the accident of noncompliance with statutory time limits where the Government is ready and able to come forward with the requisite showing to meet the burden of proof required by the statute.

Id. at 720 (citation omitted).

We reach the same conclusion here. The Walsh Act's civil commitment scheme, like the Bail Reform Act, is intended to safeguard society from persons in federal custody who would pose a serious danger if released. Volungus, 595 F.3d at 6-7. To interpret the Walsh Act to mandate release of a potentially dangerous individual due to a de minimis mistake in the timing of initiating the commitment process would be manifestly inconsistent with the overall structure of the Act. Moreover, such an interpretation would contravene the "great principle of public policy, . . . which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." Montalvo-Murillo, 495 U.S. at 718 (quoting Brock v. Pierce Cnty., 476 U.S. 253, 260 (1983)). We find nothing in the language of the Walsh Act to suggest that Congress intended such a reading.

-20-

Shields resists application of Montalvo-Murillo's reasoning on two grounds. First, he argues that more recent Supreme Court precedent has declined to countenance a general exception for "de minimis" or "technical" violations of an enactment's procedural requirements, citing Alabama v. Bozeman, 533 U.S. 146 (2001). Second, he contends that the present case can be distinguished from Montalvo-Murillo because the reference to "custody" in § 4248(a) is jurisdictional, whereas the Bail Reform Act's requirement of a timely hearing is not. If custody is a jurisdictional prerequisite to civil commitment, as Shields urges, a defect in the legality of custody might indeed deprive a federal court of subject matter jurisdiction to hear a commitment petition under § 4248(a).

To succeed, both of these lines of argument require a level of statutory specificity regarding the nature of the custody requirement and the consequences of imperfect "custody" that cannot be found in § 4248(a). Bozeman was not a repudiation of Montalvo-Murillo, but instead an example of the principle that a clear statement can trump background interpretive assumptions, such as Montalvo-Murillo's allowance for "de minimis" exceptions to an enactment's procedural requirements. In Bozeman, the Supreme Court affirmed dismissal of criminal charges due to the government's failure to comply with the "antishuttling" provision of the

-21-

Interstate Agreement on Detainers (IAD).[11]  In so doing, the Court rejected the argument that the government's failure in compliance was "de minimis" and should be ignored under <u>Montalvo-Murillo</u> and related authority.  The Court emphasized that the language of the IAD, unlike the provisions of the Bail Reform Act at issue in <u>Montalvo-Murillo</u>, stated in absolute and specific language the consequences that would flow from a violation of the antishuttling provision, namely, that "'the court <u>shall</u> enter an order dismissing the [indictment] with prejudice.'"  <u>Bozeman</u>, 533 U.S. at 153 (quoting 18 U.S.C. App. 2 § 2 (Art. IV(e))).  There is no such specificity here; § 4248(a), like the Bail Reform Act, "is silent on the issue of a remedy for violations" of the custody requirement.  <u>Id.</u> (quoting <u>Montalvo-Murillo</u>, 495 U.S. at 716).  Certainly, neither § 4248(a) nor the Walsh Act specify that a minimal defect in legal custody at the time that a commitment petition is filed requires dismissal of the petition.

Shields's argument that custody is a "jurisdictional" requirement fails for similar reasons.  The Supreme Court has cautioned that a "threshold limitation on a statute's scope" may

---

[11] The IAD provides for transfer of a prisoner held in one jurisdiction to another where charges are pending in order to allow trial to proceed, but requires, pursuant to the so-called "antishuttling" provision, "that trial must be 'had . . . prior to the prisoner's being returned to the original place of imprisonment'; otherwise, the charges 'shall' be dismissed with prejudice."  <u>Bozeman</u>, 533 U.S. at 150 (quoting 18 U.S.C. App. 2 § 2 (Art. IV(e))).

not be branded "jurisdictional" unless Congress "clearly states" its intent for the limitation to be so treated. Arbaugh v. Y & H Corp., 546 U.S. 500, 515-16 (2006) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). Here, there is no suggestion, let alone a clear statement, that Congress intended federal courts to treat the Bureau of Prison's custody of a respondent as a jurisdictional requirement for commitment proceedings under § 4248. Because § 4248(a) "'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts,'" id. at 515 (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394 (1982)), we decline to grant it jurisdictional effect.

For his last line of argument, Shields asserts that the miscalculation here was either reckless or negligent, and even if Montalvo-Murillo would permit a commitment proceeding to move forward in the face of a de minimis defect in the legality of custody, "it can do so only where [the defect in custody] . . . did not result from bad faith, recklessness or negligence." The argument is unavailing. The record indicates that the mistake in the calculation of Shields's sentence was a clerical error. The error was certainly not reckless,[12] and whether it rose to the level

_____

[12] Shields focuses on the fact that the Bureau of Prisons examiner who calculated his sentence knew that Shields was arrested on September 18, and therefore "[i]t was literally impossible for Shields to have committed his federal offense two days later, on

-23-

of negligence is immaterial.  Negligent "departures or omissions" by government officials are precisely the sort of de minimis mistakes addressed in Montalvo-Murillo.  495 U.S. at 717.  Indeed, it is this very "negligence of [government] officers or agents" that Montalvo-Murillo cautions should not ordinarily forfeit the government's ability to protect the public from potentially dangerous individuals.  Id. at 718.

In sum, a fair reading of § 4248(a) cannot justify releasing Shields to remedy a one-day delay in filing his commitment petition as a result of a de minimis error in calculating his release date.[13]

## C. The District Court's Sexual Dangerousness Finding

We turn last to Shields's challenge to the district court's finding that he was a sexually dangerous person subject to

---

September 20, 2002."  The examiner's failure to recognize the inherent inconsistency between the September 18 arrest date and the September 20 offense date used in the calculation is not as astonishing as Shields suggests.  As we note above, see supra note 5, the district court's judgment sentencing Shields on the child pornography charges listed September 20 as the "date [the] offense concluded."  The fact that the examiner apparently accepted the date of offense listed in that judgment, rather than independently questioning the logic of finding an offense to have been committed while the defendant was in custody, bespeaks -- at most -- simple carelessness rather than the sort of knowing indifference to a known risk characteristic of recklessness.

[13] We emphasize that our analysis depends on the circumstances of this case.  This case does not raise and we do not address a situation where the government knowingly and deliberately holds a defendant in custody beyond his lawful period of custody in order to file a commitment petition under § 4248.

-24-

civil commitment under § 4248. We review a district court's findings of fact following a bench trial with an advisory jury for clear error, the court's conclusions of law de novo, and any application of law to facts with some deference. Fed. R. Civ. P. 52(a)(6); Carta, 592 F.3d at 39. We have closely examined the record and find no reversible error in the district court's carefully considered and well-supported determination.

Shields does not challenge the court's resolution of the first two elements of the sexual dangerousness analysis.[14] Instead, Shields challenges only the third element: the determination of whether, as a result of pedophilia, Shields would have a "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

The question of Shields's risk of future offense was by no means an easy one. As each of the experts who testified at trial acknowledged, there is no crystal ball that an examining expert or court might consult to predict conclusively whether a past offender will recidivate. At best, offenders can be located, by means of an actuarial tool, within a population of individuals that share certain characteristics and that studies have shown to recidivate at a particular rate. These tools are, as the district court's appointed expert cautioned, "moderate" predictors of risk.

_____

[14] There is no dispute that Shields has committed prior acts of child molestation, and all three experts diagnosed Shields with pedophilia, which qualifies as a serious mental disorder.

-25-

At trial, Shields's counsel effectively elicited testimony highlighting the shortcomings of the actuarial tools, among them the fact that the studies underlying the RRASOR and Static-99 were based largely on populations outside the United States, and that data collected by the United States Department of Justice documents lower recidivism rates than the actuarial tools would predict.

In the end, however, it is for the factfinder to "'decide among reasonable interpretations of the evidence'" and "determine the weight accorded to expert witnesses." United States v. Shelton, 490 F.3d 74, 79 (1st Cir. 2007) (quoting United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991)). We find nothing to criticize in the district court's assessment of the evidence here. The court granted "little weight" to the raw scores returned by the experts' actuarial tools, and focused instead on the experts' evaluation of certain "dynamic factors" (age, treatment history, and ongoing deviant behavior) that tailor the actuarial risk assessment to an offender's individual circumstances. Of particular concern to the court and its appointed expert was Shields's failure to "seriously" engage in treatment given past opportunities: Shields offended anew after his first two courses of treatment, and refused sex offender treatment while in prison for his most recent offense. Given that the opinion by Shields's expert that Shields was not a "sexually dangerous person" rested to

a large extent on evidence of Shields's purported commitment to change, this contrary evidence was undeniably significant.

Shields argues here that the evidence does not support the district court's characterization of his treatment history, but his argument lacks force. Shields emphasizes that his first round of treatment, in the early 1990s, was not the rigorous, cognitive behavioral therapy model that is the prevailing mode of treatment today, and could not be expected to produce significant results. Following his 1998 offense, though, Shields did engage in a cognitive behavioral therapy treatment program. He tries to cast this as a success story, heralding the fact that his next crime in 2002 was not a "contact" offense but instead a conviction for possession of child pornography. The district court had ample basis to draw the opposite inference. Two of the testifying experts interpreted Shields's child pornography offense as a sign of ongoing deviance rather than improved impulse control, and it was entirely reasonable for the court to credit their testimony over Shields's expert's opinion.

Shields further argues that the district court was wrong to draw adverse inferences from his refusal to enter sex offender treatment at FCI-Butner. Shields contends that it was reasonable to forego formal treatment at the time, as he was making progress in treatment with Dr. Graney and was not in the right state of mind to benefit from sex offender treatment. That may well be the case.

However, though the episode might not be evidence of a general unwillingness to enter into sex offender treatment (the district court apparently viewed the episode that way), neither did Shields's treatment in prison offer any affirmative indication that Shields would in fact seriously engage with sex offender treatment when given a further chance to do so, as Shields's expert tried to suggest.  Dr. Graney emphasized that she was treating Shields only for depression and related issues, and that her treatment was no substitute for a formal sex offender program.  Consistent with these limitations, Dr. Graney testified that when Shields expressed a desire to "break the cycle" of offense in their sessions together, she told him he would need to address those issues in sex offender treatment.

As the district court concluded, the "bottom line" was that Shields had undergone varying forms of treatment in the past and such treatment was not wholly effective in addressing his problems.  In light of Shields's serious history of sexual crimes and the opinion of two out of three testifying clinical psychologists that he would have serious difficulty refraining from future offenses, we find the district court's determination that he was a "sexually dangerous person" within the meaning of § 4248 to be well founded.[15]

_____

[15] As described above, see supra note 9, the district court subsequently granted Shields conditional release upon a finding that he had "recovered from his mental disease or defect to the extent that his release under a prescribed regimen of . . .

-28-

In Carta, we warned that we would have limited tolerance for a "pattern in which the government certifies prisoners as sexually dangerous mere days before their scheduled release."[16] 592 F.3d at 43. Recognizing that the case before us was one of the earliest commitment proceedings to be initiated following enactment of the Walsh Act, we do not fault the government for the tardiness of its petition. However, this case highlights the problems invited by such last-minute commitment petitions. We again caution the government to make every reasonable effort to initiate commitment proceedings well in advance of a prisoner's scheduled release.

Finding no error in the district court's factfinding and legal conclusions, we affirm the commitment order in its entirety.

So ordered.

---

treatment would no longer create a substantial risk of bodily injury to another person." The commitment statute, in permitting a confined individual to petition for release roughly every six months, see 18 U.S.C. § 4247(h), implicitly acknowledges that an individual's mental health status and dangerousness may change over time with appropriate treatment. The district court's finding that Shields could safely be released, subject to treatment and other conditions, was made almost two and a half years after the court's initial commitment order was entered, and subsequent to Shields's participation in a treatment program. The court's reevaluation thus in no way casts doubt on the foundation of its initial dangerousness finding.

[16] As we noted in that case, certifying prisoners on the eve of release "guarantee[s] that they will be held for an extended period beyond that date even if there is little basis for the charge." Carta, 592 F.3d at 43.