# United States Court of Appeals
## For the First Circuit

No. 11-1626

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

JOEL WETMORE,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Lipez, Circuit Judges.

Robert B. Mann, by appointment of the court, with whom Mann and Mitchell was on brief for appellant.
Eve A. Piemonte Stacey, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief for appellee.

November 26, 2012

**BOUDIN**, **Circuit Judge**.  The Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, tit. III, § 302(4), 120 Stat. 587, 620-22 (codified at 18 U.S.C. §§ 4247-4248 (2006)), allows the federal government to seek civil commitment of "sexually dangerous persons" already in the custody of the Bureau of Prisons ("BOP").  Once ordered so committed by a federal court, the person is confined to a treatment facility until its director or a court finds that the person is no longer sexually dangerous to others, or will not be dangerous if released under a prescribed treatment regimen.  Id. §§ 4247(h), 4248(e).

Joel Wetmore, nearing the end of a federal criminal sentence, was the subject of such a civil commitment order and he now appeals.  Wetmore, 56 years old, was born and raised in Houlton, Maine; he graduated from high school there in 1975 and over the next 25 years held a variety of jobs, mostly in Maine but also including a two-year stint in Texas.  He eventually settled in Bangor, Maine, where he resided until October, 1999.  Over the course of his life, Wetmore has served several prison terms for sex-related crimes:

> -- a first conviction in 1981 at age 24, under Maine law, for unlawful sexual actions with a minor, specifically, fondling the genitals of a 12 year old boy, resulting in a 30 day suspended sentence and six months probation;
>
> -- a second conviction in 1987 at age 31, under Maine law, for gross sexual misconduct, specifically, for repeatedly molesting over a two-year period an 11-year-old boy, resulting

-2-

in an 18 year sentence of which nine years were served, with an additional four years subsequently imposed after his probation was revoked because of the offense that led to his third conviction; and

-- a third conviction in 2000 at age 44, under federal law, for possessing over 2,000 images of child pornography, leading to an 87 month sentence.

Wetmore had a BOP projected release date from his federal sentence on November 18, 2006, but, on November 17, the federal government filed a notice commencing the effort to have him certified by a court as a sexually dangerous person and to commit him civilly under the Adam Walsh Act. Under the terms of the statute, the court may commit an individual "who is in the custody of the Bureau of Prisons" if the government can prove by clear and convincing evidence that he is a "sexually dangerous person," 18 U.S.C. § 4248(a) & (d), defined as someone

who has engaged or attempted to engage in sexually violent conduct or child molestation and who...suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

18 U.S.C. § 4247(a)(5) & (6).

The district court held a seven-day bench trial beginning in late 2010 and ending in 2011.[1] The court heard expert testimony

---

[1]The lengthy delay between the government's certification and the trial is neither explained nor complained of by either side. But the primary reason is likely the constitutional challenges to the Adam Walsh Act that led to numerous stays of proceedings until

from its appointed psychological examiner, Dr. Robert Prentky, as well as from the government's retained expert psychologist, Dr. Amy Phenix. Other witnesses included government officials, prison inmates, Wetmore's mother and brother, and Wetmore himself. The testimony covered Wetmore's life history, including his sexual experiences and activities. The details are elaborated in the district court's thorough, 20-page decision. United States v. Wetmore, 766 F. Supp. 2d 319 (D. Mass. 2011).

In the decision, the district court ruled that the government had met its burden of proof, determined that Wetmore met the conditions for certification as a sexually dangerous person, and ordered him civilly committed. Wetmore now seeks review in this court, first raising a threshold issue, whether he was legitimately in BOP custody when the notice was filed; he then argues that in any event the district court erred in finding that he suffered from the requisite mental disorder and that he satisfied the statutory dangerousness test.

The threshold issue presents a legal question. The Adam Walsh Act permits the government to civilly commit sexually dangerous persons who are "in the custody of the Bureau of Prisons." 18 U.S.C. § 4248(a). At the time the government began the civil commitment proceeding on November 17, 2006, Wetmore was

---

its constitutionality was ultimately affirmed in United States v. Comstock, 130 S. Ct. 1949 (2010).

-4-

held in custody under the authority of BOP based on his federal child pornography conviction with a projected release date of November 18, 2006.  There is no indication that Wetmore had earlier disputed the November 18 date while in prison.

In 2010, shortly before his commitment hearing, Wetmore argued that the proceedings should be dismissed; he claimed that on November 17, 2006, when the government initiated the commitment process, he had not been in the "lawful" custody of BOP because his projected release date--if now re-computed--should have been earlier than November 18.  Expressing some doubt as to whether this mattered, the district court considered the premise and concluded that Wetmore had been in the lawful custody of BOP when the government sought his commitment.

The statute itself says nothing about "lawful" custody, but mere physical control could hardly suffice in all instances: imagine that Wetmore had been acquitted at trial of child pornography charges but mistakenly listed as convicted, held in prison by BOP based on this mistake and then sought to be certified during this period.  So, at the very least, some colorable legal authority must exist for the detention and the courts normally so assume.  E.g., United States v. Joshua, 607 F.3d 379, 388-89 (4th Cir. 2010) (fact of BOP physical custody alone not sufficient); United States v. Hernandez-Arenado, 571 F.3d 662, 666-67 (7th Cir. 2009) (same).

-5-

But it is a different question how far Wetmore can belatedly challenge alleged sentencing or computational errors at the commitment stage and which errors might matter. The answer is not supplied merely by the word "custody"--a chameleon term, Ramsey v. Brennan, 878 F.2d 995, 996 (7th Cir. 1989)--as applied to a variety of situations likely never considered by Congress. We already have held that, in an Adam Walsh proceeding, "to mandate release of a potentially dangerous individual due to a de minimis mistake in the timing of initiating the commitment process would be manifestly inconsistent with the overall structure of the Act." United States v. Shields, 649 F.3d 78, 87 (1st Cir. 2011), cert. denied, 132 S. Ct. 1586 (2012).

De minimis mistakes merely illustrate a larger tension. The mechanics of determining a release date are more complicated than might be supposed. The federal judge ordinarily imposes a term of months (e.g., 60 months) and, if another sentence is already being served by the defendant, chooses whether and to what extent the new federal sentence will run concurrently or consecutively to the existing sentence. 18 U.S.C. §§ 3553 (2006 & Supp. IV 2011), 3584 (2010). The defendant may then seek direct appellate review of this sentence. Id. § 3742; see also Gall v. United States, 552 U.S. 38, 47 (2007). But often there remain, as here, complicated adjustments that determine the prisoner's precise release date, depending on events that already occurred (e.g., time

-6-

spent in custody awaiting trial) or will occur later (e.g., good conduct time).[2]

These calculations are ordinarily made administratively by the Attorney General through the Bureau of Prisons, Kayfez v. Gasele, 993 F.2d 1288, 1289 (7th Cir. 1993), resulting in a posted projected release date, sometimes falling much earlier than the stated sentence of months might suggest. But these sometimes abstruse calculations, illustrated by Wetmore's own case, may involve debatable legal and factual issues. The convicted defendant can contest the projected date through an administrative proceeding, 28 C.F.R. § 542.10-.19 (2012), and, if dissatisfied, can ultimately obtain judicial review, 28 U.S.C. § 2241; see also Reno v. Koray, 515 U.S. 50, 53 (1995); Romandine v. United States, 206 F.3d 731, 736 (7th Cir. 2000).

Given the Adam Walsh Act's incontestible aim to detain individuals still sexually dangerous upon release, Comstock, 130 S. Ct. at 1960-61, the government argues that post-hoc computational attacks on the lawfulness of his detention should be limited to habeas proceedings or tempered by other exhaustion requirements. Accommodation of new statutes to existing administrative schemes is the ordinary work of courts where not

---

[2]See 18 U.S.C. §§ 3585(b), 3624(b); 28 C.F.R. § 523.1-.20 (2012); Fed. Bureau of Prisons, U.S. Dep't of Justice, P.5884.03, Good Conduct Time Under the Prison Litigation Reform Act (2006); Fed. Bureau of Prisons, U.S. Dep't of Justice, P.5880.28, Sentence Computation Manual (1999).

squarely addressed by Congress, but this is the wrong case for broad rules. As the district court ruled, Wetmore was still serving his proper federal sentence when the commitment proceeding began.

Wetmore's contrary arguments stem from a complicated chronology:

-- On October 22, 1999, he was arrested by Hampden, Maine, police after a 15-year-old male reported that Wetmore had performed a sexual act on him; a second juvenile male reported that Wetmore had child pornography on his computer.

-- On February 14, 2000, his state court parole was revoked and the court imposed the additional four year state sentence already mentioned.

-- On April 11, 2000, he was indicted on the federal child pornography charges, and entered his guilty plea on July 10, 2000.

-- On October 25, 2000 he received his 87 month federal sentence, to be served concurrently with the four-year state sentence he was then serving.

Wetmore's projected release date on his federal sentence was November 18, 2006. On November 17, 2006, the government filed its certification request.

Wetmore's first attempt to show unlawful detention is easily rebuffed. Under federal law, a defendant may receive credit against his federal sentence for "any time he has spent in official detention prior to the date the sentence commences." The provision, 18 U.S.C. § 3585(b), reads:

-8-

A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences--

(1) as a result of the offense for which the sentence was imposed; or

(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

that has not been credited against another sentence.

The Bureau of Prisons gave Wetmore 115 days of credit toward his federal sentence for his time in custody between his state arrest and the revocation of his state probation; this credit, Wetmore says, was calculated as though his state probation was revoked on February 13, 2000, when in reality it was revoked on February 14, 2000. There is some support for this claim and, on this premise, Wetmore was owed 116 days credit, making his proper release date one day earlier--namely, on November 17, 2006--the day the federal certification was filed sometime late in the afternoon.

Wetmore did not raise this argument in the district court, so it is reviewable only for plain error, Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999), and a one-day error would work no miscarriage of justice, cf. United States v. Olano, 507 U.S. 725, 736 (1993). Moreover, a preserved error would have shown at most the discrepancy of a day or less--an interval even shorter

-9-

than the one we found in Shields to be no cognizable infringement of the statute's custody requirement.  649 F.3d at 86-89.

Anyway, even accepting Wetmore's premise that he was due for release on November 17, 2006, the last day of a sentence is part of that sentence, 18 U.S.C. § 3624(a); Wetmore was still serving his sentence in BOP custody on November 17 when the government filed its request; and so the request was timely on its face and Wetmore's claim appears to fail without any help from Shields or the limits imposed by the plain error doctrine.  If it was unlawful for BOP to detain Wetmore until 11:59 pm on November 17, Wetmore has yet to explain why.

Wetmore's second theory of why his custody as of November 17, 2006, was unlawful is more complicated and involves a substantially longer period--one reason why initiating commitment proceedings a few days earlier or the Shields rule itself might not always solve the problem of belated attacks on a sentence calculation.  Wetmore says that he was owed credit on his federal sentence for all or part of the time he spent in custody between February 14, 2000 (when his state probation was revoked and he began serving his new state sentence) and October 25, 2000 (when his federal sentence was imposed).

The district judge who sentenced Wetmore for his child-pornography offense said that the federal sentence was to run concurrently with his state sentence; so, Wetmore says, his federal

-10-

sentence should therefore run from the earlier date that his state sentence began. But concurrency, in this context, typically means that the federal sentence runs alongside the state sentence from the date that the federal sentence commences. See U.S.S.G. § 5G1.3 cmt. nn.2, 4 (using the 1998 manual employed in Wetmore's sentencing). Accordingly, the BOP treated Wetmore's federal sentence as commencing on the date it was imposed, October 25, 2000. Thereafter, Wetmore's federal sentence ran simultaneously with his state sentence, and there is no evidence of any intent on the part of the sentencing judge to back-date the start of Wetmore's federal sentence in such a way that he would also receive credit for the time he had already served on his state sentence. Cf. United States v. Labeille-Soto, 163 F.3d 93, 98 (2d Cir. 1998) (asserting that sentencing judges lack authority to back-date the start of the sentences they impose).

Under subsection 3585(b)(2) (quoted above), credit against Wetmore's federal sentence could be given for his time in detention prior to the commencement of the sentence "as a result of any other charge for which [he] was arrested after the commission of the offense for which the [federal] sentence was imposed," the probation-violation sentence falling into this category. But that credit is only available if the detention time "has not been

-11-

credited against another sentence."[3]  Here, Wetmore's time in detention between the beginning of his state sentence and the start of his federal sentence <u>was</u> credited against his state sentence. As explained earlier, Wetmore also received credit against his federal sentence for the time he spent in detention between his arrest and the imposition of his state sentence.

The principle against giving double credit also disposes of Wetmore's separate claim that he should have been given credit against his federal sentence for the time he spent in the custody of U.S. Marshals between February 14, 2000, and October 25, 2000, to attend federal court proceedings while serving his state sentence.  During these periods, Wetmore was on loan by the state but still serving his state sentence; and this time was credited to his state sentence and cannot also be used to reduce further his federal sentence.

Finally, Wetmore invokes an application note in the Sentencing Guidelines which does--contrary to usual concurrency practice--allow the district judge to give a defendant the functional equivalent of credit for a separate state sentence

---

[3]Section 3585(b)(2) makes "clear that a defendant [can]not receive a double credit for his detention time." <u>United States</u> v. <u>Wilson</u>, 503 U.S. 329, 337 (1992).  Wetmore says that <u>Wilson</u> involved a different context, but the Supreme Court's interpretation reflects statutory language, and case law both in this circuit and others supports this reading. <u>United States</u> v. <u>Mills</u>, 501 F.3d 9, 11 (1st Cir. 2007); <u>United States</u> v. <u>Dennis</u>, 926 F.2d 768, 770 (8th Cir. 1991) (per curiam).

-12-

already served before a federal sentence begins.  The note, U.S.S.G. § 5G1.3 cmt. n.2, so allows in cases where the conduct underlying the state sentence is the same as that for which the federal sentence is imposed, or if the underlying conduct has been used to adjust upward the federal sentence--for example, under the relevant conduct guideline.  Lopez v. Terrell, 654 F.3d 176, 178 (2d Cir. 2011), cert. denied 132 S. Ct. 2115 (2012).

While section 5G1.3(b) primarily deals with establishing concurrent sentences (which is what Wetmore received), the application note in question also provides that when a judge imposes a sentence pursuant to § 5G1.3(b), she "should adjust the sentence for any period of imprisonment already served as a result of the conduct taken into account in determining the guideline range for the instant offense if the court determines that period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons."  U.S.S.G. § 5G1.3 cmt. n.2 (emphasis added).

Wetmore is not entitled to a re-sentencing at this stage; but anyway the district court that sentenced him made no mistake. Wetmore's state sentence stemmed from a state probation violation, and in such cases the defendant does not receive any adjustment to his federal sentence, see id. § 5G1.3(b) cmt. n.6; moreover, the revocation of Wetmore's state probation was apparently due to his prohibited contact with a minor, not because of his possession of

child pornography,[4] and there is no indication that the prohibited contact played any role in Wetmore's federal sentence.

This brings us to the merits which are far more straightforward, raising primarily factual issues, apart from one quasi-legal issue already disposed of in United States v. Carta, 592 F.3d 34 (1st Cir. 2010). The Adam Walsh Act, as already noted, requires findings that Wetmore (1) previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and, finally, (3) that "as a result" of his current mental condition he "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5) & (6).

The first requirement--here, prior "child molestation"-- was established by certified court records admitted by stipulation. Wetmore concedes this and instead argues that the other two elements--mental state and dangerousness--were not established. These must be found by "clear and convincing evidence," 18 U.S.C. § 4248(d); but the district court's factual evaluation can be overturned only for clear error, Carta, 592 F.3d at 39.

-------------------

[4]The search of Wetmore's home, which led to the discovery of child pornography, was not conducted until the day after he had already been arrested for violating the conditions of his probation. The statement of David Miranda, Operations Manager at the BOP Designation and Sentence Computation Center, bears out that Wetmore's probation was revoked for his association with children, not for child pornography.

We start with the determination, on which both experts agreed, that Wetmore does suffer from "a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(5). They based their evaluations not merely on prior convictions but on an evaluation as well of Wetmore's admitted sexual conduct and attitudes, including many other instances of child molestation, over a long period and a degree of sexual preoccupation and activity borne out by the record and by Wetmore's own admissions. Dr. Prentky also interviewed Wetmore while Dr. Phenix, whom Wetmore declined to meet, had access to records of his incarceration, police reports, and his deposition.

That Wetmore has over a long period, when not incarcerated, been a serial molester of boys below the age of consent is borne out by an elaborate record and his own admission "to sexually molesting at least eleven boys [aged] between eleven and fifteen years old." Wetmore, 766 F. Supp. 2d at 329. His obsession with this aspect of his sexual life continued even while he was serving his federal sentence and is amply documented. Wetmore's argument on the mental illness element is not based on any dispute about his history, conduct or obsession but rather about its characterization by the two experts.

Dr. Prentky diagnosed Wetmore with paraphilia not otherwise specified, with hebephilia as a specifier. He explained that "paraphilia" is an "intense recurrent pattern of erotic

-15-

interest that goes beyond normal sexual activity." The term "hebephilia" is commonly used to refer to a sexual interest in children "in the age range of eleven to fourteen." Carta, 592 F.3d at 38-39. Dr. Phenix, the government expert, diagnosed Wetmore with pedophilia, sexually attracted to males, nonexclusive type. "Nonexclusive type" means that the individual's sexual preference includes but is not limited to prepubescent children. Wetmore argues that Dr. Prentky's diagnosis is not a permissible basis for a finding of the mental illness element, and that Dr. Phenix's diagnosis of pedophilia was flawed by her inability to examine him and unsupported by his case history.

Wetmore's critique of Dr. Prentky is a replay of an issue already resolved in Carta that arises because Dr. Prentky deemed Wetmore's predominant sexual interest as boys in their early teenage years. Whether or not one describes as a mental illness mere sexual attraction to youngsters in the 11-to-14 range--which is the strict meaning of the term hebephilia--what is a mental illness, recognized in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") of the American Psychiatric Association, is a broad category called "paraphilia," whose diagnostic criteria are as follows:

> 1. recurrent, intense sexually arousing fantasies, sexual urges or behavior;
>
> 2. generally involving nonhuman objects, suffering or humiliation of a partner, or "children or other nonconsenting persons";

-16-

3.   lasting more than six months; and

4.   causing clinically significant distress or impairment, etc.

DSM-IV-TR 566, 568 (4th ed. 2000); see also Carta, 592 F.3d at 40.

This well describes Wetmore, once "distress or impairment" is understood as extending to Wetmore's condition manifested in repeated criminal molestations of male minors. Young teenagers are "children or other nonconsenting partners," Carta, 592 F.3d at 40-41; and Dr. Prentky's use of the phrase paraphilia not otherwise specified describes a listed mental disorder, see DSM-IV-TR 566, 568, with the term "hebephilia" merely identifying prepubescent children as the group to whom Wetmore is attracted. In short, Dr. Prentky's diagnosis of paraphilia satisfies the required mental element even if the issue begins and ends with the DSM. Cf. Carta 592 F.3d at 39-42.

Wetmore directs us to United States v. Neuhauser, 2012 WL 174363, at *2 (E.D.N.C. Jan. 20, 2012), which says that paraphilia not otherwise specified, with hebephilia as a specifier, is not a mental illness listed in the DSM. But while the DSM does not call hebephilia a mental illness when all that is involved is attraction, neither does it exclude pubescent children as a target of one otherwise satisfying the criteria for paraphilia. The important point is that the attraction only amounts to a mental illness--paraphilia--when it is of the form and degree that satisfies all of the above listed criteria.

-17-

Dr. Phenix's testimony was similar in substance, although she declined to limit Wetmore's diagnostic category to targeting of young teenagers. She agreed that Dr. Prentkey's diagnosis of "paraphilia NOS, hebephilia" was reasonable, but she preferred to describe Wetmore more broadly as falling into the related paraphilia subcategory of pedophilia nonexclusive type, DSM, supra, at 571-72, viewing his strong sexual interests to include both pre-pubescent and pubescent children, as well as postpubescent adolescents and even adults. The two experts' diagnoses overlapped rather than conflicted, and the district judge accepted both. Wetmore, 766 F. Supp. 2d. at 332-33.

This brings us to the third requirement under the Adam Walsh Act. Future dangerousness is often a fraught question involving prediction, and the stakes are high. Wetmore, confined since 1999, was hardly in a position to have molested children in prison. But, as Dr. Phenix pointed out, his erotic preoccupation continued while incarcerated: in 2007, he sought to obtain a book describing a sexual relationship between high-school-aged boys, and in 2008, he was found with pornographic images of young boys crafted from magazine cutouts.

Both experts agreed that Wetmore, in the words of the statute's third requirement, would have "serious difficulty" in refraining from child molestation if released. Their explanations were extensive and even the summary of their findings, tests and

-18-

analyses in the district court's decision occupies many pages.  But

the main points, omitting a wealth of detail easily supplied, see

Wetmore, 766 F. Supp. 2d at 333-36, include the following:

> -- the 40-year duration of Wetmore's sexual preoccupation with young males;
>
> -- Wetmore's past recognition of the danger posed by his conduct, including a promise to himself after his 1987 confinement not to re-offend, but simultaneous inability to refrain from further instances of molestation;
>
> -- Wetmore's limited exposure to sex offender treatment, sometimes frustrated by his own rule violations, which has given no indication of a lessening of the risk he poses or that he would be susceptible to further treatment;
>
> -- several standardized predictive tests, used by both doctors but more extensively by Dr. Phenix, which all showed a significant risk that Wetmore would reoffend, most of them scoring  him as a high-risk reoffender;
>
> -- Wetmore's lack of meaningful, long-lasting adult relationships that could protect him from reoffending; and
>
> -- Wetmore's advanced age, which, although it may sometimes temper such sexual preoccupations, did not mitigate the risk he posed given his persistent, demonstrated sexual interest in young boys.

The district court, giving lessened weight only to the

standardized predictive tests, which reflect group statistics,

accepted the explanations and the conclusion.  The trial judge

found most persuasive "Wetmore's substantial history of victimizing

young children" and the risk factors that (going forward) the

experts found were likely to maintain rather than reduce the danger

he presented.  See Wetmore, 766 F. Supp. 2d at 336-37.  The judge also pointed out that among all the witnesses called by both sides, only Wetmore's own testimony disputed the predictions that he was likely to reoffend.  Id. at 336.

Wetmore's brief does not take issue with the finding of present dangerousness.  His argument, in a nutshell, is that some combination of treatment and supervision should suffice to lessen the risk he poses and guard against reoffense.  The argument rests on evidence that there are forms of treatment that could reduce the threat; that conditions requiring treatment would normally be imposed if Wetmore were confined to supervised release; that Wetmore has expressed interest in treatment; and that family members would try to help supervise him.

The statute, however, turns on present dangerousness.  Wetmore was incarcerated for more than a decade; was expelled from a voluntary sex offender program in prison after just two weeks when he violated the rules by engaging in sexual activity with two other inmates; and has a long history of disregarding obligations and commitments.  The district court emphasized Wetmore's lack of cooperation with supervision and treatment throughout his life.  Dr. Phenix expressly opined that outpatient treatment was insufficient.

If Wetmore participates in and is responsive to inpatient sex offender treatment, he may petition for release every six

months for the duration of his confinement. <u>See</u> 18 U.S.C. § 4247(h). He can be released unconditionally if no longer dangerous or, if not dangerous under a regimen of sex offender treatment, he can be conditionally discharged subject to participating in a prescribed plan. <u>See</u> <u>id.</u> § 4248(e)(1) & (2). That point has not yet been reached.

<u>Affirmed</u>.